**John T. LIGHTNER, d/b/a Lightner Auto Sales, Third-Party Plaintiff,**

v.

**TREMONT AUTO AUCTION, INC., et al., Defendants.**

No. 82 C 20080.

United States District Court, N.D. Illinois, W.D.

April 22, 1983.

John A. Dienner, III, Pierce, Lydon, Griffin & Montana, Chicago, Ill., for third-party Plaintiff.

Cordell Siegel, St. Louis, Mo., D. Peter DeBruyne, Rockford, Ill., Dan Murray, Asst. U.S. Atty., Chicago, Ill., L. Kent Sezer, Asst. Atty. Gen., Springfield, Ill., for defendant.

## ORDER

ROSZKOWSKI, District Judge.

John T. Lightner ("Lightner"), doing business as Lightner Auto Sales, initiated the instant third-party complaint.[1] The complaint stems from an undercover F.B.I. investigation of interstate theft of automobiles and trucks. Attorney General William French Smith ("Smith"), Assistant U.S. Attorney Bruce White ("White"), and St. Louis F.B.I. Agent Barry Jones ("Jones"), (together referred to as "federal defendants"), have filed the instant motion for dismissal of the claims against them. Counts III thru VII of plaintiff Lightner's complaint deal with these federal defendants. Briefly, Count III is for deprivation of property without due process of law in violation of the Fourteenth Amendment; Count IV is for violation of 42 U.S.C. § 1983; Count V is for malicious interference with business; Count VI is for an invasion of privacy; and, Count VII is for violation of the Organized Crime Control Act of 1970, specifically the Racketeer Influenced and Corrupt Organizations ("RICO") provisions of 18 U.S.C. § 1961 et seq. As an alternative to dismissal, the federal defendants move for a transfer of venue to the United States District Court for the Eastern District of Missouri.

For the reasons set forth below, the motion to dismiss is granted with respect to Smith. As for the federal defendants, their motion for dismissal is denied with respect to all Counts. Additionally, their motion for a change of venue is denied.

## I. FACTS

The facts as alleged in Lightner's complaint are as follows. Agent Jones initiated a plan whereby David Locke ("Locke"), a "part-time agent of and informant for the F.B.I." (not a party to the instant motion), would purchase certain stolen automobiles and trucks and, by resale, enter these vehicles into the stream of commerce. To disguise the identity of stolen vehicles, Locke, who had obtained certificates of title and matching Vehicle Identification Number ("VIN") tags from wrecked and scrapped vehicles, was to replace the stolen vehicles' VIN tags with those of the wrecked and scrapped vehicles of similar description. The certificates of title for the wrecked and scrapped vehicles would thereby correspond to the VIN tags on the stolen vehicles. Thus, purchasers of the vehicles would be unaware that they were stolen. The plan was allegedly approved by federal defendants Smith and White.

Locke, after retagging some vehicles, successfully launched the plan by selling these vehicles to G.T.O. Auto Brokers, Inc. ("G.T.O."), a Missouri corporation. G.T.O. then sold or consigned the vehicles to Tremont Auto Auction, Inc. ("Tremont"), a Peoria, Illinois corporation, for the purpose of selling them to the highest bidder at auction. Lightner visited Tremont and purchased eight of these stolen vehicles. He was given the certificates of title to the vehicles—which of course matched the vehicles' VIN tags—and registered these with the State of Illinois. Finding nothing amiss, the State issued new Illinois certificates of title to Lightner.

On May 4, 1981, William Killian ("Killian"), a Dixon, Illinois Police Officer, visited Lightner Auto Sales to inspect a 1979 Trans Am which Lightner had purchased from Tremont. After inspection, Killian informed Lightner that the vehicle appeared to be stolen. In order that the State Police could make a more thorough check, Killian told Lightner to hold the Trans Am. The now suspicious Lightner requested that Killian also run a check on the other vehicles purchased at Tremont.

Within a few days, Officer Killian returned to Lightner Auto Sales with Jean

---

1. In view of this court's order of May 21, 1982 granting the petition for removal and remanding back to the state court the original action between Powers and Lightner, federal defendants' arguments concerning improper impleader are rendered moot. The action is now before this court solely for resolution of Lightner's claims against defendants, who were previously third-party defendants. Plaintiff Lightner, formerly third-party plaintiff, is granted leave to amend the complaint to reflect these changes in the positions of the parties.

Hutson ("Hutson") an Illinois State Police Officer. Trooper Hutson, in front of one of Lightner's customers, echoed the earlier proclamation of Officer Killian that the car appeared to be stolen. Hutson told Lightner that the car would have to be removed to a garage for further inspection—a proposition to which Lightner readily agreed— and the Trans Am was taken away.

Within a few days, the Trans Am was returned to Lightner's lot. Trooper Hutson telephoned to inform Lightner that the car was not stolen. He also told Lightner that the other vehicles which he had purchased from Tremont were "OK" and he was free to sell them.

Unknown to Lightner, however, the vehicles in question had actually checked out as stolen. While the vehicles were under inspection, F.B.I. Agent Jones had allegedly telephoned Officer Killian and Lieutenant William Ostergrant, also a Dixon Police Officer. Ostergrant and Killian were told of the ongoing F.B.I. undercover scheme. Based on a request by Agent Jones, the officers ended their investigation of the cars in question. Lightner was not told of this scheme; he merely received the call from Trooper Hutson which cleared the vehicles.

In addition to this incident at Lightner's lot, the complaint alleges another Illinois incident in which certain of these scheme vehicles were almost removed from commerce, but instead resulted in Lightner once again unwittingly dealing in stolen vehicles. Apparently, Byron Svendson, another Illinois State Police Officer, had visited Tremont Auto Auction in Peoria on June 10, 1981, and impounded two cars as stolen. One of these cars was subsequently released and sold to Lightner. While the complaint alleges no reason for this release, documents filed with Lightner's brief in the instant motion, if true, show that Trooper Svendson knew that the car was stolen when he released it and that the release was at the request of St. Louis FBI Agent Jones.

Approximately five months passed before Lightner discovered the true nature of the vehicles he had sold. Trooper Hutson presented Lightner with a list of VIN's belonging to vehicles Lightner had sold— among which were the VIN's of the above mentioned vehicles—and directed Lightner to call in these vehicles. Lightner was told to provide loaner cars to the purchasers and, if the vehicles proved to be stolen, purchase the cars from the insurance companies who had paid claims on them and then return them to the customers. When Lightner refused to comply with Hutson's directive, Hutson allegedly threatened retaliation.

Hutson told Lightner that unless he cooperated, certain undesirable "police tactics" would be employed: marked police cars and uniformed officers would be used to seize the vehicles from Lightner's customers and the cars would be forcefully taken from the customers' residences or places of business. Such a procedure is alleged to have taken place with respect to two of the vehicles Lightner had sold.

It is based on these facts that Lightner brings this action. While these "facts" are at present mere allegations, it is hornbook law that the defendant admits the allegations of the complaint for purposes of a motion to dismiss. *City of Milwaukee v. Saxbe,* 546 F.2d 693, 704 (7th Cir.1976). *See also Mescall v. Burrus,* 603 F.2d 1266 (7th Cir.1979).

## II.  JURISDICTION

Before rendering any decision concerning a cause of action, a federal court must have both subject matter and personal jurisdiction over the claim and its parties. Lightner's complaint against the federal defendants arises under the Constitution and laws of the United States and as such is properly within the subject matter jurisdiction of this court. 28 U.S.C. § 1331. The federal defendants, however, contend that this court lacks *in personam* jurisdiction over them.[2]

**2.**  As it is the opinion of this court that Attorney    General Smith should be dismissed from this

The Supreme Court has frequently inquired into the limits of *in personam* jurisdiction under the due process clause. *See, e.g., World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980); *Shaffer v. Heitner,* 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977); *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The constitutional standard set forth initially in *International Shoe, supra,* requires that a defendant "have certain minimum contacts with [the forum State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" 326 U.S. at 316, 66 S.Ct. at 158 (citation omitted). An essential criterion in each case is that the "quality and nature" of the defendant's activity be such that it is "reasonable" and "fair" to require him to conduct his defense in that State. *Kulko v. California Superior Court,* 436 U.S. 84, 92, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978).

In the instant case, the allegations against the federal defendants show sufficient contact with Illinois to make it reasonable and fair to require them to present their defense here. Considering the close proximity of St. Louis to Chicago, the likelihood that their scheme would flow over into Illinois was great. Indeed, a document submitted by Lightner for purposes of the instant motion indicates that at least a portion of their scheme was specifically targeted at Illinois. Regardless of any original intentions, once scheme vehicles were identified in Illinois and the local law enforcement personnel were contacted to keep these vehicles in the stream of commerce, the federal defendants from that point on clearly were running an Illinois investigation. All this was done with the knowledge that these disguised stolen vehicles might injure innocent Illinois consumers.

So, here we have more than the unacceptable situation where long-arm jurisdiction is

exercised merely because some of the vehicles "happened" into Illinois; more than a situation where "amenability to suit would travel with the chattel." *World-Wide Volkswagen, supra,* 444 U.S. at 297, 100 S.Ct. at 567. Rather, the federal defendants purposefully availed themselves of the privilege of conducting activities within Illinois. By acting to conceal the true nature of stolen vehicles from Illinois' consumers, the federal defendant's should easily have anticipated the possibility of being "haled into court [here]." *Id.* This is all that is required to satisfy due process.

Admittedly, were the federal defendants' sole contact with Illinois the telephone call by Agent Jones, the Seventh Circuit case, *Jadair, Inc. v. Walt Keeler Co., Inc.,* 679 F.2d 131 (7th Cir.1982), cited by the federal defendants, would suggest a lack of *in personam* jurisdiction. Telephone calls are not separate contacts with jurisdictional significance. 679 F.2d at 134. *Jadair,* however, involved a dispute arising from a commercial transaction where the plaintiff seller attempted to use telephone calls to establish the requisite minimum contacts with the forum state simply because the defendant's only other contact was that "his seller's place of business [was] located there." *Id.*

*Jadair* is simply inapplicable here. As shown above, the federal defendants allegedly undertook to send disguised stolen vehicles, each a potential lawsuit, into Illinois. There are sufficient minimum contacts with Illinois here without referencing the calls. The telephone calls from Agent Jones serve only to demonstrate the federal defendants' knowledge of the connection between their scheme and Illinois, as well as their efforts to continue this scheme. They either knew, or should reasonably have expected, that their interference with the investigation of Trooper Svendson at Tremont in Peoria would cause cars which would otherwise have been removed from Illinois commerce to remain in Illinois commerce where they could move on to hurt

---

suit (see below) there is no need to discuss the federal defendant's contention of insufficient service of process with respect to Smith. Federal defendants White and Jones were personally served with summons and complaint. The validity of this extra-territorial service rests on this court's determination with respect to *in personam* jurisdiction. Fed.R.Civ.P. 4(e).

Illinois citizens. They also either knew, or should reasonably have expected, that their interference with the investigation in Dixon would keep the cars in Illinois commerce even longer and cause even more harm to Lightner. Accordingly, *in personam* jurisdiction presently exists in this case as to St. Louis F.B.I. Agent Jones and Assistant U.S. Attorney White.

■ As to Attorney General Smith, this court feels that his involvement has not been sufficiently shown. It is conceivable that a local Assistant U.S. Attorney may be involved in an undercover F.B.I. investigation.[3] The Attorney General of the United States, however, is unlikely to be personally involved in such a scheme. The Supreme Court cautions against allowing "insubstantial lawsuits" against high public officials such as Attorney General Smith to proceed to trial. *Butz v. Economou,* 438 U.S. 478, 507, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978). The lower courts are to be alert to the possibilities of "artful pleading." *Id.* Lightner's bald allegations against Smith of "knowledge" and "participation" amount to such a situation and the complaint against Smith is therefore dismissed. Should discovery reveal his actual personal involvement, the complaint may be amended to add him as a defendant.

## III. VENUE

The federal defendants assert that regardless of whether this court has jurisdiction over this case, venue is improper and the matter should either be dismissed or transferred to the Eastern District of Missouri.

### A. *Proper Venue*

■ The venue provisions of 28 U.S.C. § 1391(b) apply to actions for money damages brought against federal officials in their individual capacities.[4] *Stafford v. Briggs,* 444 U.S. 527, 544–45, 100 S.Ct. 774,

784–85, 63 L.Ed.2d 1 (1980). Section 1391(b) provides that venue is proper "in the judicial district where all defendants reside, or in which the claim arose." Lightner makes no argument that the federal defendants reside in Illinois. Indeed, the two remaining federal defendants, Jones and White, both reside in the Eastern District of Missouri and venue would therefore be proper there. The conflict thus is whether this "claim arose" at Lightner's dealership in the Northern District of Illinois, or in the Eastern District of Missouri where the defendants acted.

Lightner's assertion that the claim arose in this district finds support in *Stafford, supra,* 444 U.S. 527, 100 S.Ct. 774, 63 L.Ed.2d 1. *Driver v. Helms,* 577 F.2d 147 (1st Cir.1978) was one of the two cases consolidated for review in *Stafford.* In *Driver,* various plaintiffs had brought suit against William Colby, then Director of the CIA, and certain other federal officials. The plaintiffs charged that their mail had been tampered with in violation of the Constitution. All of the alleged tampering took place in New York City. In determining proper venue under § 1391(b), the Supreme Court stated:

> As to petitioner Colby, the proper venue would have been the Eastern District of New York *where the alleged claim arose,* or perhaps the Eastern District of Virginia, where some acts may have occurred at the headquarters of the CIA."

*Stafford, supra,* 444 U.S. at 544 n. 11, 100 S.Ct. at 785 n. 11 (emphasis added). Colby was not alleged to have personally tampered with the mail in New York, he was merely charged with having directed these allegedly unconstitutional activities from CIA headquarters in Virginia. Thus, the Supreme Court viewed where the "claim arose" as meaning the place where the allegedly unconstitutional activities physically

---

3. This, of course, does not relieve Lightner of the burden of actually establishing such involvement at trial.

4. Since all counts of the complaint seek only money damages, any suit against the defendants in their *official* capacity is by necessity an unconsented suit against the United States and as such is not allowed. *United States v. Mitchell,* 445 U.S. 535, 538, 100 S.Ct. 1349, 1351, 63 L.Ed.2d 607 (1980).

**1118**

occurred and only *possibly* as the place from which these activities were orchestrated.

■ In the instant case, like Director Colby in *Driver,* the federal defendants are charged with having orchestrated a scheme from a location different from where the physical constitutional violation—the taking of Lightner's property in violation of due process and its associated business harms— is alleged to have occurred. Based on the Supreme Court's interpretation, Lightner's "claim arose" in the Northern District of Illinois, the District in which he was physically deprived of property, and *perhaps* in the Eastern District of Missouri where some of the federal defendants' acts occurred. Under § 1391(b), then, venue is proper in this district. *See also Patmore v. Carlson,* 392 F.Supp. 737 (E.D.Ill.1975) (cause of action for monetary relief "arose" against prison director, who controlled prison procedures from outside federal judicial district in which prison was located, in the prison district where the unconstitutional deprivations had physically taken place).

The federal defendants' reliance on *Leroy v. Great Western United Corp.,* 443 U.S. 173, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979), is misplaced. The Court in *Leroy* merely refused to equate "the district in which the claim arose" with the district where the impact was felt. Here, the Northern District of Illinois is the locus for more than just where Lightner felt the impact of the federal defendants' acts. This is the district where the vehicles were allegedly seized in violation of due process; it is the district where the physical constitutional violation took place. Venue is therefore proper here.[5]

### B. *Transfer of Venue*

■ The federal defendants also urge that even if venue is proper before this court, 28 U.S.C. § 1404(a) mandates transfer to the Eastern District of Missouri. Section 1404(a) provides that for the "con-

venience of parties and witnesses" and "in the interest of justice" a district court may transfer a civil action to another district where it might have been brought. This court is not convinced that transfer is appropriate in this case.

The federal defendants argue that *Chicago, Rock Island, and Pacific R.R. v. Igoe,* 220 F.2d 299 (7th Cir.) (en banc), *cert. denied,* 350 U.S. 822, 76 S.Ct. 49, 100 L.Ed. 735 (1955), mandates a transfer of venue. *Igoe* listed factors to be considered by a district court when faced with a transfer request under Section 1404(a). The factors to be considered are: the convenience of witnesses of both parties; the ease of access to sources of proof; the availability of compulsory process to compel the attendance of unwilling witnesses; the smaller amount of expense required for willing witnesses; the availability of a view of the premises; and, the state of the court calendar both in the District where the case is pending, and in the District to which it is sought to have the case transferred. *Igoe, supra,* 220 F.2d at 303. Simply stated, the federal defendants' position is that these factors weigh in their favor and require transfer.

First, this court is not convinced that the balance of witnesses favors trial in Missouri. It appears that some events occurred in Missouri and some occurred in Illinois. There may be witnesses from Missouri, but there will also be numerous witnesses from Illinois. Indeed, Lightner's witnesses with respect to damages could conceivably all be in Illinois. There is, therefore, no clear advantage concerning witness convenience, access to proof, compulsory process, or saved travel expense in either location. There seems to be no reason for a "view of the premises" here. Finally, as to scheduling, the calendar of this court is not so congested as to preclude an orderly progression of this case.

**5.** The federal defendants are incorrect in their argument that the RICO venue provision, 18 U.S.C. § 1965, mandates dismissal of the RICO claim. The venue provisions of Section 1965 are not to be exclusive. Rather, they were intended to liberalize the already existent ven-

ue provisions of Title 28. Therefore, since venue is proper under 28 U.S.C. § 1391(b), it is unnecessary to consider the more liberal Section 1965. *See Van Schaick v. Church of Scientology of California, Inc.,* 535 F.Supp. 1125; 1133 n. 6 (D.Mass.1982).

The plaintiff's choice of forum, if proper, should rarely be disturbed. *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 102 S.Ct. 252, 265, 70 L.Ed.2d 419 (1981). Since there is no clear advantage to a trial in either location and venue is proper in the Northern District of Illinois, Western Division, this court will defer to Lightner's choice of forum.

## IV. IMMUNITY

In a suit against government officials such as the present federal defendants, the issue of official immunity must be addressed. Where the federal official enjoys absolute immunity, this will act as a bar against suit. In situations where the federal official enjoys only a qualified immunity, certain elements of good faith must be shown for the immunity to bar suit.

In the instant case, the federal defendants claim absolute immunity from suit with respect to the malicious interference with business and invasion of privacy claims set forth in Counts V and VI, respectively. As to the due process and racketeering violations alleged in Counts III, IV and VII, these defendants assert only that their activities were all undertaken in good faith as part of a "*bona fide*" F.B.I. undercover investigation. This impliedly raises the defense of qualified immunity. A proper disposition of the federal defendants' instant motion to dismiss all counts must therefore be based on whether immunity bars this action.

### A. *Qualified Immunity*

Prior to the Supreme Court's decision in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978), the exact scope of a federal officials immunity from suit was unclear. The Court in *Butz* established a qualified immunity for government officials performing discretionary functions. *Id.* at 504, 98 S.Ct. at 2909. Such an immunity was thought necessary to assure that the actions of these government officials would not be overly checked by the potentially disabling threat of suit. Absolute immunity from suit was considered undesirable since in situations of abuse of office,

an action for money damages against the official often times offers the only avenue for vindication of constitutional guarantees. *Id.* at 506, 98 S.Ct. at 2910. Qualified immunity, then, strikes a middle ground in protecting a conscientious official while subjecting those who mistreat their position to damages.

■ In *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), the Court provided additional guidance as to the scope of the *Butz* qualified immunity. Government officials performing discretionary functions are shielded from civil liability as long as "their conduct does not violate clearly established statutory or constitutional rights of *which a reasonable person would have known.*" *Id.* —— U.S. at ——, 102 S.Ct. at 2738, 73 L.Ed.2d at 410 (emphasis added). The proper standard for reviewing the officials' actions is an "objective" one:

> By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct. The public interest in deterrence of unlawful conduct and in compensation of victims remains protected by a test that focuses on the objective legal reasonableness of an official's acts. *Where an official could be expected to know that certain conduct would violate statutory or constitutional rights he should be made to hesitate; and a person who suffers injury caused by such conduct may have a cause of action.*

*Id.* —— U.S. at ——, 102 S.Ct. at 2739, 73 L.Ed.2d at 411 (emphasis added). Thus, a district court presented with an alleged statutory or constitutional violation by a federal official must review the facts and determine whether the officials actions were undertaken in good faith with a reasonable belief in their constitutional validity. *Accord, Brubaker v. King,* 505 F.2d 534 (7th Cir.1974).

■ Count III of Lightner's complaint alleges a deprivation of property in violation of the due process clause of the Four-

teenth Amendment.[6] Viewing the facts alleged in support of this claim in a light most favorable to Lightner, this court is not prepared to say as a matter of law that the federal defendants had the requisite good faith reasonable belief in the constitutionality of their scheme. The FBI scheme clearly led to Lightner being deprived of property. As to whether a reasonable person would have thought the deprivation would be without due process, we recognize first that due process deals with fairness. It seems that a reasonable person would have known that it was unfair to cause stolen vehicles which would have been intercepted by the Illinois police to remain in the stream of commerce when the natural and probable consequence of this act would be to hurt innocent people. This is a situation contemplated by *Harlow:* these defendants should have hesitated before engaging the scheme. —— U.S. at ——, 102 S.Ct. at 2739, 73 L.Ed. at 411. Lightner, as a person who has suffered injury caused by their conduct, may have a cause of action.

Should the facts bear out the federal defendants' assertion that this was a "bona fide" investigation undertaken with a reasonable belief in its constitutionality, this court will gladly uphold the federal defendant's qualified immunity. For now, though, the limited amount of information presented to this court militates in favor of a conclusion that the federal defendants should have known their actions might violate due process rights and their motion to dismiss Count III must be denied. *See, e.g., Crowder v. Lash,* 687 F.2d 996, 1007 (7th Cir.1982) (question of fact whether defendant officials should reasonably have known

that their conduct would violate clearly established constitutional norms).

For these same reasons, the federal defendant's qualified immunity defense will not presently serve as a bar to the civil rights claim under § 1983 in Count IV or the RICO claim of Count VII. Until the federal defendants show that they should not reasonably have expected that their investigation would violate these statutes, these Counts will not be dismissed. At present, these defendants have not met their burden of proof. *See Harlow, supra,* —— U.S. at ——, 102 S.Ct. at 2736, 73 L.Ed.2d at 408.

■ The federal defendants claim that § 1983 does not apply to them is incorrect. In *Hampton v. Hanrahan,* 600 F.2d 600 (7th Cir.1979), the Seventh Circuit expressly recognized the validity of suits under § 1983 against federal officials. Where there is a conspiracy alleged with state officials as in Count IV of Lightner's complaint, and those state officials play a significant role in the conspiracy, "the state officials provide the requisite state action to make the conspiracy actionable under Section 1983." 600 F.2d at 632.

The federal defendants further object to the RICO claim alleged in Count VII of the complaint on the grounds that they did not possess the criminal scienter requisite to such a claim. Once again this is a factual question and must be resolved against the movant federal defendants for purposes of the instant motion to dismiss. The federal defendants must show that no set of facts could support Lightner's claim. *Conley v.*

---

**6.** The federal defendants correctly argue that actions of the Federal Government and its officers are beyond the purview of the Fourteenth Amendment. *District of Columbia v. Carter,* 409 U.S. 418, 424, 93 S.Ct. 602, 606, 34 L.Ed.2d 613 (1973). This court is given wide latitude, however, to allow Lightner to amend his complaint to properly allege a Fifth Amendment due process violation. Fed.R.Civ.P. 15(a).

The Supreme Court has held that in cases like the instant one, where "it is damages or nothing" and damage actions are not expressly forbidden, a direct cause of action under the Fifth Amendment is available. *Davis v. Pass-*

*man,* 442 U.S. 228, 245–246, 99 S.Ct. 2264, 2277, 60 L.Ed.2d 846 (1979). Although such suits against federal officials for unconstitutional actions taken in the course of their official conduct raise "special concerns counseling hesitation", those concerns are coextensive with the protection afforded by official immunity. *Id.* Lightner, then, may amend Count III to state a cause of action against the federal defendants under the Fifth Amendment due process clause. The question here becomes whether such a claim is barred by the federal defendant's qualified immunity.

*Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).

### B. *Absolute Immunity*

As discussed above, the Supreme Court in *Butz* allowed federal executive officials only a qualified immunity from suits based on constitutional claims. In reaching its decision, however, the *Butz* Court did not remove from these officials their traditional absolute immunity from suits based on state common law torts. *Butz* merely refused to extend absolute immunity to "an official who has not only committed a wrong under local law but also violated those fundamental principles embodied in the Constitution." *Butz, supra,* 438 U.S. at 496, 98 S.Ct. at 2905.

■ As the law currently stands, a government official enjoys absolute immunity from claims involving state common law torts so long as the acts complained of were performed with the scope of the official's duties. This grant of absolute immunity is not an absolute license to act with callous disregard for the limitations of a particular office. The immunity is only absolute for those officials who conform to the plain limits of their statutory authority. *Butz, supra,* 438 U.S. at 496, 98 S.Ct. at 2905; *see, also George v. Kay,* 632 F.2d 1103 (4th Cir.1980); *Sami v. United States,* 617 F.2d 755 (D.C.Cir.1979). *See generally* Lynch, *Butz v. Economou and Federal Executive Officials' Immunity: Much Ado About Nothing?,* 59 U.Det.J.Urb.L. 281 (1982).

Counts V and VI of the complaint allege malicious interference with business and invasion of privacy respectively. These are common law torts.[7]

Since absolute immunity is an affirmative defense to be raised by the federal defendants, the burden of proof is on them to prove that they acted with the scope of

their authority. *Harlow, supra,* —— U.S. at ——, 102 S.Ct. at 2736, 73 L.Ed.2d at 407. They have not yet met this burden. At such time as this is shown, the state law claims of Counts V and VI may appropriately be dismissed.

### V. CONCLUSION

For the above stated reasons, the motion to dismiss is granted with respect to defendant Smith. As to the remaining federal defendants, jurisdiction and venue are proper in this district. Their motion to dismiss is denied with respect to all Counts. The federal defendants' motion for transfer of venue to the Eastern District of Missouri is also denied.

---

**7.** While the complaint alleges a constitutional violation in Count VI, these tort allegations do not assume constitutional dimension simply because the plaintiff states them as such. *See Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). In its discussion of the immunity of federal officials, the Supreme

Court stated in *Butz:* "federal courts [should be] alert to the possibilities of artful pleading . . . and firm application of the Federal Rules of Civil Procedure will ensure that federal officials are not harassed by frivolous lawsuits." 428 U.S. at 507–08, 98 S.Ct. at 2911.