Anne POWERS, Plaintiff,

v.

John T. LIGHTNER, d/b/a Lightner Auto Sales, Defendant, Third-Party Plaintiff-Appellee,

v.

Barry JONES and Bruce White, Third-Party Defendants-Appellants.

No. 84–2312.

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1984.

Decided May 8, 1987.

Rehearing and Rehearing En Banc Denied Aug. 3, 1987.

---

Douglas Letter, Dept. of Justice, Civ. Div., Washington, D.C., for third-party defendants-appellants.

John A. Dienner, III, Pierce Lydon Griffin & Montana, Chicago, Ill., for defendant, third-party plaintiff-appellee.

Before FLAUM, Circuit Judge, and WISDOM* and PELL, Senior Circuit Judges.

PER CURIAM.

In accordance with the result reached in the respective opinions of Judge Flaum and Judge Pell, the judgment of the district court is reversed and the cause is remanded for further proceedings in accordance with the following opinions.

PELL, Senior Circuit Judge.

Two federal officials appeal from an order of the district court denying their motion for summary judgment on qualified

* Judge John Minor Wisdom, Senior Circuit Judge of the United States Court of Appeals for the    Fifth Circuit, is sitting by designation.

immunity grounds. We first held that the district court's order was not an appealable interlocutory order, *Powers v. Lightner,* 752 F.2d 1251 (7th Cir.1985), but in light of *Mitchell v. Forsyth,* 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), which held that such an order is an appealable final decision notwithstanding the absence of a final judgment, we vacated our earlier judgment. Because the federal officials should have been entitled to summary judgment on qualified immunity grounds, we reverse the district court's order and remand for further proceedings consistent with this opinion.

■ In this opinion, I do not reach Lightner's argument that the Government's action was a taking for which just compensation would have been required.[1] Furthermore, while this circuit has consistently held that the Racketeer Influenced and Corrupt Organizations Act (RICO) must be given the broad effect mandated by its plain language, *see, e.g., Morgan v. Bank of Waukegan,* 804 F.2d 970, 974 (7th Cir. 1986), because Lightner failed to allege facts sufficient to make out the element of criminal intent in his RICO claim, this claim should have been dismissed by the district court. *See Baucom v. Martin,* 677 F.2d 1346, 1350 (11th Cir.1982). I consider here only the issue of qualified immunity.

### I.

Because this court previously discussed the facts of this case in our original opinion, *Powers,* 752 F.2d at 1252–53, I need to only repeat those facts necessary for our disposition on appeal. The principal issue before us, now that we know from *Mitchell* that we have an appealable order, is whether Jones and White in this case had qualified immunity. In my opinion, they did.

From October 1980 through March 1982, the St. Louis FBI office conducted an undercover criminal investigation, known as "Operation Recoupe," into stolen vehicle enterprises. Operation Recoupe was described in *Georgia Casualty and Surety Co. v. United States,* 582 F.Supp. 49 (E.D. Mo.1984). The FBI operated a vehicle salvage yard in which agents purchased auto wrecks with valid titles and vehicle identification number (VIN) tags from cooperating insurance companies. These agents then sold the wrecks with the VINs and titles to targeted suspects who allegedly ran a "retagging" business. These suspects distributed the cars to auctioneers. The cars were then bought by used cars dealers and ultimately sold to the public.

In June 1981, FBI Special Agent Barry Jones provided a VIN tag and title for a Chevrolet Monte Carlo to David Lauck, a used car dealer also working as a FBI informant. Lauck put the tags and title on a stolen Monte Carlo which would subsequently be auctioned through the Tremont Auto Auction. An Illinois State trooper noticed this car, independently suspecting that it and a second car might have been stolen, and he took the cars to his station. Lauck alerted Jones, who telephoned the trooper and informed him of the undercover operation. The trooper returned cars to Tremont and told the auctioneer that the cars were not stolen.

Lightner Auto Sales purchased the Monte Carlo at the auction and then resold it to Anne Powers. This car was seized at the end of Operation Recoupe and returned to its proper owner. Powers sued Lightner for a refund in state court, and Lightner then filed a third party action against the auto auction, the U.S. Attorney General, Jones, Lauck, Assistant U.S. Attorney Bruce White, and several Illinois police officers, seeking damages under 42 U.S.C. § 1983 for deprivation of property without due process. Lightner also alleged a RICO claim against the federal defendants, who removed the case to district court.

The district court granted the motion to dismiss the Attorney General but denied it as to Jones and White. *Lightner v. Tre-*

---

**1.** The district court did not address this issue. Yet the Government's failure to stop injury to property does not constitute a taking under the Fifth Amendment. *See National Board of YMCA v. United States,* 395 U.S. 85, 89 S.Ct. 1511, 23 L.Ed.2d 117 (1969). We refuse to create such a novel cause of action in Lightner's case. *See generally Andrus v. Allard,* 444 U.S. 51, 64–68, 100 S.Ct. 318, 326–28, 62 L.Ed.2d 210 (1979).

*mont Auto Auction, Inc.,* 564 F.Supp. 1112 (N.D.Ill.1983). Jones and White now appeal from those portions of the order denying their request for summary judgment on the ground of qualified immunity.

The two federal officials claim that they are entitled to qualified immunity, an affirmative defense on which they carry the burden of proof. *Harlow v. Fitzgerald,* 457 U.S. 800, 815, 102 S.Ct. 2727, 2737, 73 L.Ed.2d 396 (1982). Qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818, 102 S.Ct. at 2738; *Davis v. Scherer,* 468 U.S. 183, 194 n. 12, 104 S.Ct. 3012, 3019 n. 12, 82 L.Ed.2d 139 (1984).

The standard that the federal officials must meet is an objective one. It is irrelevant whether either defendant knew at the time he acted or failed to act that his actions violated someone's constitutional rights. *Kompare v. Stein,* 801 F.2d 883, 887 (7th Cir.1986); *Bates v. Jean,* 745 F.2d 1146, 1151 (7th Cir.1984). Until a particular constitutional right has been stated so that reasonably competent officers would agree on its application to a given set of facts, it has not been "clearly established" for purposes of *Harlow. See Benson v. Allphin,* 786 F.2d 268, 275–76 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). Moreover, as this court recently held, "The words 'clearly established ... constitutional rights' may not be used to read the defense of immunity out of federal tort law by the facile expedient of stating constitutional rights in the most general possible terms. ... The right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir. 1986); *see also Chapman v. Pickett,* 801 F.2d 912, 920 (7th Cir.1986) (Easterbrook, J., dissenting).

The task is to re-examine the law in light of plaintiff's allegations and supporting evidence to decide if the alleged constitutional violation was "clearly established" at the time the incidents occurred. *Wade v. Hegner,* 804 F.2d 67, 70–71 (7th Cir.1986). Closely analogous cases, those decided before the defendants acted or failed to act, are required to find that a constitutional right is clearly established. *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 822, 88 L.Ed.2d 795 (1986). My research has failed to disclose any cases indicating that Lightner had a constitutional right to have the two federal officials notify him that the Monte Carlo he was buying was part of the operation. Nor did Lightner have a right to compensation from them for the loss of his automobile.

The law controlling this issue has been quite unsettled. *Johnson v. Breljc,* 701 F.2d 1201 (7th Cir.1983). Therefore, "[i]n the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established under *Harlow.*" *Capoeman v. Reed,* 754 F.2d 1512, 1514 (9th Cir.1985). A review of these cases should focus only on rights clearly established in their respective contexts, *Crowder v. Lash,* 687 F.2d 996, 1007 (7th Cir.1982), and this court must not expect reasonable government officials "to recognize the significance of a few scattered cases from disparate areas of the law for a right that is just evolving." *Lojuk,* 770 F.2d at 628. No analogous cases point to any of Lightner's claimed rights or the federal officials' corresponding duties.

In *Redmond v. United States,* 518 F.2d 811 (7th Cir.1975), the Securities and Exchange Commission permitted the plaintiff to be defrauded by a con man. This court rejected the plaintiff's contention that the "national government may be held liable for damages resulting from criminal conduct," and we held that there is no "legally-enforceable duty on the part of the Government to warn or to compensate victims of criminal activity." *Id.* at 816. Lightner's situation is remotely analogous to *Redmond,* for the Government here need not have warned him of the sting nor compensate him for the loss of the Monte Carlo.

This lack of duty comes from the Government's role as an enforcer in the undercover operation which had to be kept absolutely secret to preserve the sting's success. Lightner has failed to demonstrate that the Government could have notified potential innocent buyers such as Lightner that the automobile in question was stolen without jeopardizing the entire operation. *See Georgia Casualty and Surety Company,* 582 F.Supp. at 51. Here the law enforcement officials appeared to choose the alternative presented by public versus private interests that would result in the least amount of harm, *United States v. Intercontinental Industries Inc.,* 635 F.2d 1215 (6th Cir.1980), and they wisely recommended that the Illinois State trooper stop intervening in the matter.

■ A second analogous case is *Beard v. Mitchell,* 604 F.2d 485 (7th Cir.1979), where the question was whether an FBI agent had a duty to prevent a murder. In that *Bivens* action, the court held that the plaintiff had to demonstrate the defendant's recklessness, i.e., the defendant had to act with the knowledge that its conduct was unreasonable or culpable. *Id.* at 495. The court distinguished the situation in *Bonner v. Coughlin,* 545 F.2d 565 (7th Cir.1976), *cert. denied,* 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 529 (1978), where intentional conduct was an element of the civil rights claim. Recently, this court has acknowledged that "it would be illogical to extend good faith immunity to a government official who has intentionally violated an individual's constitutional rights." *Perry v. Larson,* 794 F.2d 279, 284 n. 1 (7th Cir. 1986). I cannot hold that White and Jones intentionally tried to deprive Lightner of his property even though it turned out that was the fallout of the sting operation. The agents did intervene to prevent the Illinois State trooper from impounding the automobiles he suspected were stolen. This action, however, was not sufficient to put this case in the ambit of those involving an intentional violation of due process. *See Jackson v. City of Joliet,* 715 F.2d 1200 (7th Cir.1983) (discussing distinction between negligent and intentional conduct).

The inquiry is not over, however, for this court must apply the *Harlow* standard to see if the defendants' actions were objectively reasonable. In balancing the interests of Lightner to receive compensation and damages for the loss of his car with the interests of the Government in maintaining a successful undercover sting operation, the "facts of the existing case law must closely correspond to the contested action before the defendant official is subject to liability under *Harlow.*" *Benson,* 786 F.2d at 276. My review of the case law reveals no closely analogous decisions which should have indicated to the officials that their conduct in the undercover operation was unreasonable.

This balancing test, on the other hand, reaches a "foregone conclusion" favoring injured parties in the event of an "egregious situation." *Benson,* 786 F.2d at 276 n. 18. The question remains, however, whether the alleged governmental misconduct here was so "truly outrageous" as to indicate a due process violation. *United States v. Kaminski,* 703 F.2d 1004, 1009 (7th Cir.1983). I do not believe it was. In order to detect the retagging operation, the agents needed to participate in the unlawful practices. *See United States v. Russell,* 411 U.S. 423, 432, 93 S.Ct. 1637, 1643, 36 L.Ed.2d 366 (1973). In the situation presented here, the law enforcement conduct—intervening to prevent a trooper from perhaps frustrating a major investigation—certainly stops short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment. *Kinsella v. United States,* 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960).

While I recognize that a few innocent citizens such as Lightner may have suffered individual losses due to Operation Recoupe, I believe this court should refuse to hold the FBI agents and U.S. Attorneys liable for their good-faith conduct in giving priority to the maintenance of secrecy for the sting operation. In such an undercover investigation, losses by a few may be necessary to obtain important evidence to prevent future crimes suffered by the general

public. The manner in which our prisons are filling to the point of overcrowding graphically demonstrates the necessity of governmental resort to procedures that at an earlier time would have been deemed, if not intolerable, at least beneath the dignity of the Government. One might venture to say that the general welfare is involved. A frequent example is the use of informants who themselves have a criminal background and, indeed, commit crimes while acting on behalf of the Government. Yet the success of these methods in fighting crime, including the one of the type here involved, has been repeatedly demonstrated. It is an unfortunate consequence of achieving what is for the overall good of the public that some property loss may occur to presumably innocent individuals.

For the reasons cited above, both Special Agent Jones and Assistant U.S. Attorney White were entitled to qualified immunity for their participation in Operation Recoupe. The standard that the plaintiff attempted to impose on both officials was not "clearly established" under existing caselaw. The nature of undercover criminal investigations like Operation Recoupe is such that federal officials must be given the freedom in which to exercise their discretion in ensuring the success of their sting operations. There is no genuine issue of material fact, and both Jones and White were entitled to judgment as a matter of law.

FLAUM, Circuit Judge, concurring in the judgment.

The precise issue presented in this appeal is whether the federal officers involved are qualifiedly immune from suit. To decide this issue, we are obliged to examine whether injuries to innocent victims of federal undercover investigations may violate the Fifth Amendment's Due Process Clause. I conclude that it is unnecessary to definitively resolve this particular inquiry in the context of this case.[1] Although Judge Wisdom's dissent is constitu-

tionally appealing, because this precise due process question has not been previously addressed by any federal court, I conclude that the officers involved are immune from suit. I therefore join Judge Pell in reversing the judgment of the district court.

### I.

The Supreme Court has recently spoken in the area of qualified immunity. *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In *Harlow* the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* at 2738. This court recently stated that "whenever a balancing of interests is required the facts of the existing case law must closely correspond to the contested action before the defendant official is subject to liability under ... *Harlow.*" *Benson v. Allphin,* 786 F.2d 268, 276 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 172, 93 L.Ed.2d 109 (1986). Furthermore, for officials to lose their qualified immunity, *Harlow* requires that the constitutional rights in question must be clearly established; this means that the "right must be sufficiently particularized to put potential defendants on notice that their conduct probably is unlawful." *Azeez v. Fairman,* 795 F.2d 1296, 1301 (7th Cir.1986). Under *Harlow's* objective standard, any due process rights that Lightner may have possessed were not clearly established at the time of the alleged injury in this case.

This court in *Benson* noted that there may be "a situation in which the defendant's actions are so egregious that the result of the balancing test will be a foregone conclusion, even though prior caselaw may not address the specific facts at issue." *Benson,* 786 F.2d at 276 n. 10. I do not believe that this is a case where the defendants' conduct is so egregious as to strip

---

1. The facts underlying this suit are fully discussed in Judge Pell's opinion and will not be repeated here.

them of their qualified immunity. However, if a future case with more compelling facts than this situation should arise, the defendants might not be so shielded.

## II.

I therefore conclude that we need not resolve whether or not any of Lightner's possible due process rights, as guaranteed by the Fifth Amendment, have been violated. I find that any possible due process rights Lightner may have under the facts of this case were not "clearly established," as required by *Harlow;* thus, the defendants are immune from suit in this case.

WISDOM, Senior Circuit Judge.

I respectfully dissent.

The government's discretion to conduct undercover investigations, although necessarily broad, is not unlimited. The due process clause protects even criminal defendants against "truly outrageous" government misconduct.[1] As the Supreme Court observed in *Stanley v. Illinois,*[2] "one might fairly say of the Bill of Rights in general, and the Due Process Clause in particular, that they were designed to protect the fragile values of a vulnerable citizenry from the overbearing concern for efficiency and efficacy that may characterize praiseworthy government officials no less, and perhaps more, than mediocre ones."[3]

I would hold that the FBI exceeded the limits of its discretion. Had the FBI not intervened directly, the car in question would not have been sold to an innocent purchaser. This case therefore differs from the more usual case in which the FBI simply participates in an ongoing criminal enterprise without causing additional crime.

The substantive due process right implicated in this case requires a balancing of interests. On the one hand is the government's interest in discovering and prosecuting criminals. On the other hand is the citizen's right not to be the victim of a crime created wholly by the government. Officials of the FBI have long known that their conduct during an undercover operation may invade the due process rights of citizens involved in the investigation. For example, targets of the investigation may not be entrapped.[4] The FBI knew that civil liability may attach for particularly egregious conduct in entrapment cases.

I am confirmed in my conclusion that the FBI's handling of Operation Recoupe or Recoup was "truly outrageous" by the criticism it has generated in the public and in Congress. Recoupe and other operations similar to it have been the subject of critical newspaper articles and congressional hearings.[5] The Subcommittee on Civil and Constitutional Rights of the Judicial Committee of the House of Representatives investigated Operation Recoup among other undercover operations. The subcommittee had this to say about the sting operation:

In Operation Recoup a 1981 investigation of stolen car racketeering in the South and Midwest, the Bureau apparently used its own agents to set up a bogus used car business, Le Blanc Motors, in which wrecked cars were sold to "retaggers" who then replaced the motor vehicle identification tags on stolen automobiles with those of the wrecked vehicle. FBI agents also operated as intermediaries in several sales of stolen and retagged automobiles to used car dealers. Those sales were made with the knowledge that the cars would be subsequently resold to innocent purchasers who would ultimately lose title to them.[6]

---

1. *United States v. Kaminski,* 703 F.2d 1004 (7th Cir.1983).

2. 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972).

3. *Id.* at 656, 92 S.Ct. at 1215.

4. *See United States v. Kaminski,* 703 F.2d 1004 (7th Cir.1983).

5. The Washington Post, August 3, 1985, at A3; The Times-Picayune/The States-Item, June 12, 1986, at A–14; FBI Undercover Operations, H.R. Doc. No. 98–267, 98th Cong., 2nd Sess. (1984).

6. "Asked after the investigation whether the operation could not but harm innocent people, the Assistant Special Agent in Charge of the St. Louis FBI office responded affirmatively.

As of October 1982 more than 250 cars had been confiscated from innocent purchasers.[7] In addition, of course, the business reputations of the dealers who sold the automobiles have been irreparably injured. Operation Recoup has spawned a number of lawsuits claiming millions of dollars in damages by innoct sellers and purchasers of stolen automobiles.[8]

H.R. Doc. 98–267, 98th Cong., 2nd Sess. (1984), p. 22.

The sad fact is that in Operation Recoupe the FBI victimized innocent citizens by knowingly selling stolen cars and now refuses to reimburse the purchasers. The costs of such an operation should be borne by the United States government, not by the innocent victims.

Rockford (Ill.) Register Star, p. 1a". H.R. Doc. 98–267, 98th Cong. 2nd Sess. (1984), p. 22 n. 51.

**7.** Wall Street Journal, October 7, 1982, p. 1.

**8.** Claims in excess of $47 million have been filed against the United States as a result of Operation Recoup, none of which have been settled (see "FBI Undercover Activities," *supra,* at 457). Here, too, the Department of Justice has resisted all efforts to disclose through dis-

covery the FBI's role. (December 22, 1983 telephone conversation with attorney for the defendant, third party defendant in *Powers v. Lightner,* U.S. District Court, Northern District of Illinois, Western Div. 82 C 20080, and *Powers v. Lightner,* Court of the Fifteenth Judicial Circuit, Lee County, Illinois, No. 22–LM 16.) H.R. Doc. 98–267, 98th Cong., 2nd Sess. (1984), p. 22 n. 52.