Glenn B. BARNHILL, Plaintiff-Respondent,††

v.

BOARD OF REGENTS OF THE UW SYSTEM:
Harry P. Sharp, Director, Wisconsin Survey Research
Laboratory, UW-Extension, Robert Lee, Field Director,
Wisconsin Survey Research Laboratory, UW-Exten-
sion, Defendants-Appellants.†

Court of Appeals

*No. 89–0372. Oral argument October 10, 1989.—Decided
September 27, 1990.*

(Also reported in 462 N.W.2d 249.)

††Petition to cross-review granted.

†Petition to review granted.

284

For the defendants-appellants the cause was submitted on briefs of *Donald J. Hanaway,* attorney general, with *Robert D. Repasky,* assistant attorney general. Oral argument by *Robert D. Repasky.*

For the plaintiff-respondent the cause was submitted on briefs of *Borns, Macaulay & Jacobson,* by *Jacqueline Macaulay,* of Madison. Oral argument by *Jacqueline Macaulay.*

Before Eich, C.J., Gartzke, P.J., and Sundby, J.

GARTZKE, P.J. Harry Sharp and Robert Lee appeal from a judgment for $80,665.87 against them in favor of Glenn Barnhill. Barnhill claims they discharged him from his job with the University of Wisconsin-Extension Survey Research Laboratory (WSRL) in retaliation for speech protected by the first amendment to the United States Constitution.

The issues are whether: (1) Sharp and Lee violated Barnhill's first amendment rights of free speech; (2) Sharp and Lee are entitled to qualified immunity from suit against them in their personal capacities; and (3) Barnhill is entitled to punitive damages. We conclude that Sharp and Lee violated Barnhill's right of free speech and are not immune from suit. We also conclude, however, that the jury was improperly instructed concerning punitive damages, which prevented the real controversy from being tried with respect to that issue. We

reverse the judgment under sec. 752.35, Stats., and remand for a new trial on punitive damages only.

## 1. PROCEDURAL BACKGROUND

Barnhill was a part-time interviewer for WSRL. Sharp is WSRL's director and Lee was its field director. Barnhill sued them and the Board of Regents of the University of Wisconsin System (Regents) under 42 U.S.C. sec. 1983,[1] alleging he was fired in retaliation for giving information about a shopping mall survey to newspapers.

The jury found that no later than March 26, 1985[2] Barnhill was "discharged because he disclosed materials concerning the shopping mall survey to the newspaper(s)" and that "retaliation for exercise of his first amendment rights [was] a primary factor in [his] discharge." The jury awarded Barnhill $16,000 for lost earnings, $20,000 for mental anguish, and $25,000 punitive damages.

Sharp, Lee, and the Regents moved for judgment notwithstanding the verdict and for a new trial. They

[1] 42 U.S.C. sec. 1983 provides in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[2] Defendants never conceded that they had discharged Barnhill. Although the jury found he had been discharged no later than March 26, 1985, that date was established because it time-bars Barnhill's second claim for retaliatory discharge under sec. 895.65, Stats. An action under that statute must be brought within two years, sec. 895.65(2). Thus, while the jury found that Barnhill had been discharged no later than March 26, 1985, it was not asked to determine the exact date of his discharge.

287

asserted that they had not violated Barnhill's first amendment rights, they are entitled to qualified immunity, and the award is excessive. The trial court denied the motion on the first two grounds but granted Sharp and Lee a new trial on damages for lost earnings. The court dismissed all claims against the Regents because they are entitled to absolute immunity.

The parties then stipulated that Barnhill's lost earnings were $5,200 and that his reasonable attorney's fees, costs, and disbursements were $30,465.87. The trial court entered judgment in favor of Barnhill and against Sharp and Lee for $80,665.87, and Sharp and Lee appealed.

## 2. FIRST AMENDMENT RIGHTS OF PUBLIC EMPLOYEES

■

If a public employee claims to have been impermissibly disciplined because of speech activity, the analysis is a multi-step process. *Melton v. City of Oklahoma City,* 879 F.2d 706, 713 (10th Cir. 1989).

> First, the court must determine whether a public employee's speech touches upon a matter of public concern. *Connick [v. Myers],* 461 U.S. 138, 103 S. Ct. 1684. Second, if the statement satisfies the public concern inquiry, the court must then balance the interests of the employee in making the statement against the public employer's interest in the effective and efficient fulfillment of its responsibilities to the public. *Pickering v. Board of Educ.,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Third, assuming that both previous elements have been found in favor of the plaintiff, he or she must then prove that the protected speech "was a 'motivating factor' in the detrimental employment decision." *Mt. Healthy City School Dist. v. Doyle,* 429

U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). Fourth and finally, if plaintiff makes this showing, the burden then shifts to the employer to show by a preponderance of evidence that it would have reached the same decision in the absence of the protected activity. *Id. . . .* [T]he first two steps of the process involve questions of law for the court, the two-part *Mt. Healthy* analysis involves questions of fact for the jury. *Koch v. City of Hutchinson,* 847 F.2d 1436, 1440 n.11 (10th Cir) (en banc) *cert. denied,* — U.S. —, 109 S.Ct. 262, 102 L.Ed.2d 250 (1988).

*Melton,* 879 F.2d at 713.

The trial court concluded that Barnhill's speech had nothing to do with dissatisfaction over internal employment conditions. Rather, it related to a matter of public concern. Sharp and Lee do not dispute that Barnhill's disclosure constituted speech on a matter of public concern. They focus their argument on the second step in the analysis. They argue that the balancing of interests under *Pickering* weighs in their favor rather than Barnhill's.

When deciding the motions after verdict, the trial court did not explicitly perform the necessary *Pickering* balancing. It noted that the jury found the balance of interests weighed in favor of Barnhill and that the finding was advisory only. It apparently adopted that "finding" as its own conclusion of law.

The balancing of interests under *Pickering* is a question of law for the court. *Melton,* 879 F.2d at 713, *Wren v. Spurlock,* 798 F.2d 1313, 1317 (10th Cir. 1986). A trial court errs by leaving the question to the jury. *Wren,* 798 F.2d at 1318. However, the error does not

require reversal if our legal conclusion matches the jury's "finding." *Id.*

The trial court made no findings concerning facts material to the balancing of interests under *Pickering.* We have two options stemming from the failure of the trial court to make findings of fact supporting its conclusion of law. *Dodge v. Carauna,* 127 Wis. 2d 62, 67, 377 N.W.2d 208, 211 (Ct. App. 1985). First, we may independently review the record and affirm the court's decision if the evidence sustains findings supporting the trial court's conclusion, and reverse if not. Second, we may reverse and remand the matter to the court to make findings of fact and conclusions of law.

We choose the first option. The record is extensive and complete. We have reviewed it and conclude that the material evidence is undisputed. We now recite the evidence.

### 3.  EVIDENCE

Sharp is a University of Wisconsin-Madison faculty member. He has been the director of WSRL since its formation twenty-five years ago and is an expert in survey research. He is primarily responsible for developing the questionnaires used in WSRL research. Lee was the field director of WSRL. His duties included supervision of interviewers and other personnel involved in actually performing surveys using questionnaires developed by WSRL.

WSRL generally avoids commercial market research but does research on customer preferences for trade associations and nonprofit organizations. WSRL is funded entirely from fees received from clients request-

ing survey research. It has an excellent reputation in its field.

The validity of survey research depends upon the confidentiality of the survey questions during the period that the survey is being conducted. A reputation for disclosing the text of survey questions before the survey is completed can harm the business of a survey research organization.

WSRL employs part-time interviewers to question randomly selected individuals. The interviewers are required to sign and follow a pledge of confidentiality which reads in relevant part:

> I will maintain professional ethical standards of confidentiality while performing my duties. This means all *information obtained during the course of conducting this research* will be held in strict confidence. [Emphasis added.] I know this is priviledged [sic] information and as such I promise to uphold the Laboratory's standards.
>
> I am aware that the rights of human subjects is [sic] a prime concern to the Laboratory and that all study procedures are reviewed to ensure that individual respondents are protected at each stage of research.

Barnhill was a part-time interviewer beginning January 30, 1984. He signed a pledge of confidentiality. He had no prior expertise in survey research.

Although Sharp testified that he believed the language of the pledge extended to the disclosure of the questions from survey questionnaires, he acknowledged that it was ambiguous. Barnhill testified that he understood the pledge to apply only to information received from persons surveyed, such as a disclosure of a filled-out questionnaire. He testified that his training class and the

291

training manual discussed confidentiality only in those terms. A coworker testified to the same effect.

WSRL's "Manual for Telephone Interviewers," in its discussion of the pledge of confidentiality, speaks only to protecting survey data and other information obtained through interviews. It suggests that the interviewers tell interviewees about the pledge on occasion.

In the fall of 1984, the International Council of Shopping Centers, a trade association, contracted with WSRL for a survey of shoppers' attitudes toward group activities in malls. Sharp prepared the survey questions with input from the sponsor. WSRL conducted a "pretest" consisting of 100 interviews. This was done to examine questions for clarity and to do preliminary statistical analyses.

Before the pre-test, Barnhill attended a briefing on November 23, 1984 regarding the survey. He left the meeting. When the meeting leader asked why, Barnhill expressed displeasure that WSRL was doing a survey on the topic. The leader told him that he need not participate, and he did not.

At that time, litigation concerning the free speech rights of individuals and groups in shopping malls was pending in Dane county circuit court. The facts and history of that litigation are recited in *Jacobs v. Major*, 132 Wis. 2d 82, 91–95, 390 N.W.2d 86, 88–90 (Ct. App. 1986), *aff'd*, 139 Wis. 2d 492, 496–501, 407 N.W.2d 832, 833–35 (1987). One of the defendants was Nu Parable, "an unincorporated dance group organized by [defendant] Major and others to publicly perform a choreographed depiction of the results of nuclear warfare as a political statement." 139 Wis. 2d at 497, 407 N.W.2d at 834.

On November 27, 1984, Barnhill wrote to Lee. His letter read as follows:

I recently expressed to Doris [the pre-test meeting leader] my concern about the shopping center survey (project 1613) that the Wisconsin Survey Research Lab has undertaken for the shopping mall trade association.

Doris informed me that I would not be required to contribute to the study. I appreciate that my political conscience has been respected by the university—in accord with the principles the university represents.

While I appreciate not being required to personally participate in this study, I feel compelled to explain why I believe this is an inappropriate study for the university to be undertaking.

We, as members of a university community, cannot continue to pretend that the applications of our research are of no concern to our research choices or designs. Increasingly our scientific techniques are being used in ways that threaten our democratic society and in fact, threaten our very existence as a species. We must think about the consequences of our work and the moral questions involved.

The question at issue in this study is free speech. This is a right guaranteed in the First Amendment of our Bill of Rights. It was made explicit so that free speech could not be usurped by public opinion, shopping mall owners, or anyone else.

The issue is a legal question and will appropriately be decided by the courts. The university should not be lending its name and reputation to one party in this dispute. Would the survey look the same if the ACLU had designed the questionnaire? Clearly a bias has been introduced by our client that may be used in a partisan way that may not be in the public interest. And isn't public interest what the university is supposed to represent?

Our democratic nation and the university depend upon open public discussion. The vitality of

democracy requires that there be as many places for expression of diverse points of view as possible. Alternative viewpoints to prevailing orthodoxy are restricted by the cost of mass communication, and access to free speech in public places must be protected.

Lee shared the letter with Sharp, who considered the letter but did not respond to it. Barnhill continued to work for WSRL.

On January 23, 1985, while the full survey was in progress, Lee received a phone call from a reporter for the *Capital Times,* a Madison newspaper. The reporter told Lee that the newspaper had the text of the shopping center survey questions, but did not reveal his source. Lee told Sharp about the conversation.

Lee then issued a memorandum to WSRL field staff, dated Wednesday, January 23, 1985, which read in relevant part:

> A very serious violation of confidentiality has occurred at the Lab. A reporter for the *Capitol Times* [sic] has obtained a copy of the interview schedule for a project currently in the field. The reporter informed us the copy came from a member of the WSRL staff but did not identify the individual.
>
> It has always been Lab policy to make public the schedule of interview questions *only after* a project has been taken from the field . . ..
>
> The person or persons involved in making the schedule available outside the Lab have violated the oath of confidentiality they are committed to as a Lab employee.
> . . ..
> It is our firm belief that anyone who cannot agree to and carry out our rules of confidentiality should not work for the Lab.

> We are certain that all but one or two of the
> Lab's employees carry out their jobs in a completely
> professional manner, one that is above reproach. We
> thank those people. [Emphasis in original.]

The memorandum was posted and also mailed to the entire staff. Barnhill was not working during that week.

The next Sunday, January 27, 1985, while the survey was being conducted, an article was published in the *Milwaukee Journal* paraphrasing some of the survey questions. The article stated in part:

> Mall owners' property rights outweighed the right of
> an anti-nuclear group to perform its dance of protest
> in the thick of all the various activity that gives life
> to two local shopping centers, a judge here ruled last
> week.
>
> At the same time, interviewers employed at the
> University of Wisconsin's Survey Research Labora-
> tory were making random telephone calls across the
> state, asking questions that hinted at the issues in
> the case of the Nu Parable Dancers:
>
> Would the presence of such groups in part of a
> shopping center cause you to avoid that part of the
> center? To cut down on your shopping time? To find
> another shopping center? Or, consumers were asked,
> would you consider them entertaining and educa-
> tional, and thus find the time in the center more
> enjoyable?
>
> Should shopping center owners keep all such
> groups out of the mall, have the right to pick and
> choose among them, or should the center be open to
> all special-interest groups?

The article quoted both Barnhill and Sharp.

Barnhill admits he allowed the *Milwaukee Journal* to examine the survey questions. He gave conflicting testimony as to whether he knew about the January 23,

1985, memo at that time. He maintains that he never disclosed the text of the survey questions to the *Capital Times.*

Sharp ordered the survey interviews stopped after he learned of the *Milwaukee Journal* article. Sharp testified that the survey had been completed and its integrity had not been compromised. However, WSRL and the sponsor had contracted for 1,000 interviews to be performed, with total costs estimated at $14,025. The survey concluded with 956 usable interviews, with final costs of $11,106.84.

On February 7, 1985, *The Daily Cardinal,* a University of Wisconsin-Madison student newspaper, published an article on the survey. It quoted Barnhill, Sharp, and two anonymous interviewers who agreed with Barnhill's position. The article quoted survey questions and Barnhill's interpretations of certain questions. The survey was not then in progress. The jury found that Barnhill was discharged not later than March 26, 1985. He had performed no work for WSRL since December 1984.

### 4. BALANCING BARNHILL'S FREE SPEECH RIGHT AGAINST WSRL'S INTERESTS

We turn to the *Pickering* balancing in which we weigh the interest of the employee in commenting on a matter of public concern against the interest of the employer in promoting the efficiency of its public services. *Pickering,* 391 U.S. at 568. We conclude that the balance of interests falls heavily in Barnhill's favor.

When balancing the interests of Barnhill and his employer, we take into account the political nature of Barnhill's exercise of his right to speak openly. Freedom of speech is perhaps the most basic of our civil liberties. Without it, few of our liberties can long exist. With it, all other liberties are reinforced. Barnhill exercised his right

of free speech to comment about the relationship between the state university and private business. The public concern in that relationship is not only substantial but is, in essence, political. That factor weighs heavily in Barnhill's favor.

Against Barnhill's interest in speech we must balance the employer's interest. We consider the following factors: (1) the effect of Barnhill's conduct on discipline and harmony among fellow workers; (2) WSRL's need for confidentiality; (3) whether the conduct impeded Barnhill in competently performing his duties; (4) WSRL's need to encourage a relationship involving loyalty and confidence between the employee and his superiors; (5) the manner, time, and place in which Barnhill's speech was delivered; (6) how directly the speech touches upon matters of public concern; and (7) the presence or absence of work rules or announced policy regulating Barnhill's speech. *Connick v. Myers*, 461 U.S. 138, 151–54 (1983); *Clark v. Holmes*, 474 F.2d 928, 931 (7th Cir. 1972), *cert. denied*, 411 U.S. 972 (1973).

Several of these factors have little bearing on this case. Barnhill's conduct was not shown to have affected discipline and harmony among those of his colleagues familiar with the events. No evidence exists that Barnhill's conduct impeded the performance of his duties. He was excused from further participation in the survey before he made the disclosures, and he did little or no work for WSRL after the disclosures. The relationship between Barnhill and his superiors was not one requiring unusual loyalty or confidence. The other factors call for greater analysis.

Regarding the time, place and manner of Barnhill's speech, Sharp and Lee argue that, before going to the

newspapers, Barnhill should have waited until the survey had been completed. In fact, Barnhill *did* wait until the survey was nearly completed. He testified that he knew the survey would be ending "roughly during that time" in which he spoke to the *Milwaukee Journal* and the *Daily Cardinal.* WSRL halted the survey shortly after publication of the first news article, but nevertheless obtained 956 usable responses toward its goal of 1000.

Sharp and Lee argue that Barnhill should have waited until the survey results were used or presented. That might have been a more convenient time for Sharp and Lee, but we decline to impose on employees the burden of delaying speech to a time more convenient to the employer. In many cases, the time will never come when the employer will consider it convenient for the speech to occur. It is not appropriate to require employees to guess when the convenience of the employer has been sufficiently served so that they might speak without risk of discipline. In this case, the timing of Barnhill's conduct did little more than inconvenience and embarrass the employer.

Confidentiality and work rule violations are the factors weighing most heavily on the employer's side. As a preliminary matter, we must determine the extent of WSRL's interest in confidentiality.

When an employer has a desire for routine confidentiality, and uses written pledges and manuals to communicate that desire, it is reasonable for an employee to believe that those documents fully state the employer's policies. When an employer has written policies, an after-the-fact argument that an unexplained need for confidentiality existed will not be accorded significant weight in the *Pickering* balance. The WSRL confidenti-

ality pledge and employee manual were ambiguous, at best, on the confidentiality of survey questions. WSRL did not effectively communicate a rule that survey questions were confidential. Although Sharp and Lee had an interest in maintaining the confidentiality of the survey questions, they did not protect that interest.

However, Lee's January 23 memo to staff following the phone call from the *Capital Times* unambiguously stated that WSRL believed the questions to be confidential. If when Barnhill spoke to the *Milwaukee Journal* he knew about the January 23 memo, then WSRL had communicated to Barnhill its belief that the questions were confidential. Accordingly, WSRL would have a stronger confidentiality and work rule interest under the *Pickering* test than if it had not so communicated.

■

Barnhill provided conflicting testimony regarding his knowledge of the January 23 memo.[3] As discussed above, the trial court made no findings of fact to support

---

[3]At his deposition (portions of which were read into the record at trial) Barnhill testified that he did not disclose the survey questions to the *Capital Times*. He said several times that when he spoke to the *Milwaukee Journal* he was aware of the January 23 memo discussing the call from the *Capital Times,* although he could not recall how: "I was aware that someone had released the information to the *Capital Times* and that the survey was in circulation, and that the person who had done that had violated what they consider a violation of the rulings of confidentiality [sic] . . .. My position is that the information had already been released to one member of the press and presumably was going to be published, and that talking to another member of the press was not breaking new ground."

After his deposition, Barnhill signed an affidavit correcting his testimony. The affidavit states that he did not know about the January 23 memo at the time he spoke with the *Milwaukee Journal.* His testimony at trial was in accord with the affidavit. He

its *Pickering* conclusion. This court may not find facts when the evidence is in dispute. *Wurtz v. Fleischman,* 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155, 159 (1980). We hold, however, that even if we accept the version of events that creates the strongest interest for the employer, Barnhill's speech interest prevails.

Under that version, an unknown informant released the questions to the *Capital Times.* Barnhill knew from reading the January 23 memo that WSRL considered the questions confidential. He also knew that a "person or persons" had disclosed the questions to the *Capital Times.* Accepting Barnhill's most self-damaging testimony, he then violated a confidentiality rule by speaking to the *Milwaukee Journal.* Under this version, the case is similar to *Hanneman v. Breier,* 528 F.2d 750 (7th Cir. 1976).

The plaintiffs in *Hanneman* were Milwaukee police union leaders under investigation for violation of departmental rules. They were advised that the investigation was confidential. A newspaper revealed the existence of the investigation. The leak was not attributed to the officers. The officers then wrote a letter to public officials complaining that the investigation was driven by anti-union animus. The letter revealed no unpublished facts. The department disciplined the officers for violating its confidentiality rule.

The plaintiffs filed a sec. 1983 action. The Seventh Circuit applied the *Pickering* test to determine whether the employer's interest in confidentiality outweighed the employees' interest in speech. The court focused primarily on the fact that the newspaper article had already disclosed the information in question:

---

further testified that nothing in his training had led him to believe that WSRL considered survey questions confidential.

Under these circumstances, we do not believe that the state interests which support the police department's confidentiality rule justify its application in this case. By the time plaintiffs' letter appeared, the ability of the chief of police to conduct his internal investigation in private had already been destroyed by publication of a front-page newspaper article disclosing the existence of the investigation and the persons and subjects involved.

In view of the prior newspaper coverage, the only new disclosure in plaintiff's letter was their unfounded charge that Chief Breier was acting for improper anti-union motives . . ..

Of course departmental discipline may be undermined when police officers disobey an official regulation and an express order not to disclose police business. The department's general interest in discipline alone, however, does not outweigh the individual and public interest in the subject of plaintiffs' September 17 letter. Once the matter was placed in the public eye, plaintiffs, as officers of the certified collective bargaining representative of nonsupervisory policemen, had a legitimate interest in bringing any improper anti-union conduct by the chief of police in connection with the now-publicized investigation to the attention of influential government officials outside the police department. The finding by the district court that the investigation was not motivated by anti-union animus does not negate plaintiffs' interest in soliciting outside support which they believed to be necessary at the time.

*Hanneman,* 528 F.2d at 754–55 (footnotes and citation omitted).

Lee's January 23 memo states the *Capital Times* had already received the survey questions. Barnhill's discussion with the *Milwaukee Journal* therefore revealed

nothing that was not already in possession of the *Capital Times*. The fact that the January 23 interpretation of the confidentiality agreement attempted to bar such disclosures, and that Barnhill knew of the interpretation, is not sufficient to overcome Barnhill's speech interest.[4]

The final factor we must consider is how directly Barnhill's speech touched upon matters of public concern. Sharp and Lee do not dispute that Barnhill's speech affected such a matter.[5] His speech touched that matter with sufficient directness. Barnhill's speech was intended to expose what he perceived as university action favoring business at the expense of the first amendment.

After considering all the *Pickering* factors, we conclude that the employer's interest is insufficient to justify infringement of Barnhill's right of free speech.

### 5. *MT. HEALTHY* ISSUES

The last part of the analysis to determine whether an employee has been unlawfully disciplined because of a free speech exercise is that required by *Mt. Healthy City*

---

[4]If we were to accept the second version of Barnhill's testimony, then he spoke to the *Milwaukee Journal* believing that his was the first disclosure, but that it was not barred by any confidentiality rule whether in the pledge or the January 23 memo. The relevance of *Hanneman* to our *Pickering* balancing would not be changed by Barnhill's lack of knowledge about the *Capital Times*, since the *Capital Times'* possession of the survey is not disputed. Only the weight of the employer's confidentiality interest changes.

[5]What the relationship between the university and business should be is not before us. We hold only that it is a public concern.

*School Dist. v. Doyle,* 429 U.S. 274, 287 (1977) (*see* our excerpt from *Melton,* pp. 288–89). *Mt. Healthy* requires the plaintiff to show that his speech was a substantial or motivating factor in his dismissal. The verdict satisfied this requirement. The jury not only found that Barnhill was discharged because he disclosed materials concerning the shopping mall survey to the newspapers but that "retaliation for exercise of First Amendment rights [was] a primary factor in [his] discharge."

Because of that finding, the burden was on Sharp and Lee to show that their decision to discharge Barnhill would have been the same regardless of his protected speech. *Mt. Healthy,* 429 U.S. at 287. However, it is too late to resolve that issue of fact. Sharp and Lee failed to request an appropriate instruction and question in the special verdict, and they do not contend that error occurred in this regard.[6]

Our analysis of the free speech issue satisfies us that Barnhill's speech was protected and that his discharge for the exercise of his right of free speech was an unlawful violation of that right. Sharp and Lee are liable to Barnhill unless they have qualified immunity.

## 6. QUALIFIED IMMUNITY

Qualified immunity is a defense available to a public employee against whom a 42 U.S.C. sec. 1983 action is brought in his or her personal capacity. *Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982). Sharp and Lee are such employees. The defense protects "government officials

---

[6]Furthermore, the trial court held in response to a post-trial motion that even if such an instruction had been given, the evidence was insufficient to support a verdict on that issue in Sharp and Lee's favor.

performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow,* 457 U.S. at 818.

The defense depends on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Id.* (footnote omitted). The question is whether the law "was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not . . . be fairly said to 'know' that the law forbade conduct not previously identified as unlawful." *Id.*

The availability of the qualified immunity defense is a question of law for the court. It is not a mixture of fact and law for the jury. *Alvarado v. Picur,* 859 F.2d 448, 451 (7th Cir. 1988). We review questions of law *de novo.*

Sharp and Lee direct their argument to the "clearly established law" element of the test. They contend that, as applied to this case, *Rakovich v. Wade,* 850 F.2d 1180 (7th Cir. 1988), requires Barnhill to show decisional law specifically related to restricting the disclosure of survey questions by an employee interviewer, where the disclosures presented a risk of invalidating the survey. In short, they contend that they are immune from Barnhill's suit unless before January 1985 some other court had decided that a public employer who conducted opinion surveys violated the free speech right of an employee by discharging him for releasing survey questions to news media before the survey was completed when the employer believed that such disclosure was prohibited by a pledge of confidentiality.

We reject the claim that prior case law must have been that precisely analogous to have put Sharp and Lee on notice that they could not retaliate against an employee because he spoke on a. matter of public concern.

Sharp and Lee base their argument on *Benson v. Allphin*, 786 F.2d 268, 276 & n.17 (7th Cir.), *cert. denied*, 479 U.S. 848 (1986):

> [T]here is one type of constitutional rule, namely that involving the balancing of competing interests, for which the standard may be clearly established, but its application is so fact dependent that the "law" can rarely be considered "clearly established." . . . It would appear that, whenever a balancing of interests is required, the facts of the existing caselaw must closely correspond to the contested action before the defendant official is subject to liability under . . . *Harlow.*

The Ninth Circuit questioned whether *Benson* should be read so broadly. In *Roth v. Veteran's Admin.*, 856 F.2d 1401, 1408 (9th Cir. 1988), the defendants argued that because a court must balance competing interests in a fact-specific process, public officials cannot be expected to predict the outcome of such balancing or engage in it themselves. The court rejected this argument because:

> [W]e essentially would be holding that public employees can never maintain a [sec. 1983] action alleging retaliation for exercise of their first amendment rights because adjudicating these claims requires particularized balancing. We decline to adopt a rule that would effectively eviscerate whistleblower protection for public employees.

The Tenth Circuit rejected *Benson* in *Melton v. Oklahoma City,* 879 F.2d at 729 (10th Cir. 1989). The court said qualified immunity "cannot become an insuperable barrier . . .. *In some circumstances,* the fact-specific nature of the *Pickering* balancing may preclude a determination of 'clearly established' law," but "to the extent that courts in *analogous (but not necessarily factually identical)* cases have struck the necessary balance, government officials will be deemed 'on notice' . . .." 879 F.2d at 729 and n.36 (emphasis added). The court said, "a simple black letter rule is not possible," and that except through case-by-case application, the rule cannot be better stated. 879 F.2d at 728–29. We agree, and conclude that existing caselaw was close enough to have warned Sharp and Lee in 1985 that discharge of Barnhill for his speech activity would be unlawful.

### 7. QUALIFIED IMMUNITY OF SHARP AND LEE

The relevant question before us is the objective question whether a reasonable official could have believed that discharging Barnhill was lawful, in light of clearly established law and information the officials possessed. Sharp and Lee's subjective beliefs about the discharge are irrelevant. *Anderson v. Creighton,* 483 U.S. 635, 641 (1987).

The jury did not establish the date on which Barnhill was discharged. The jury did find, however, that he had been discharged no later than March 26, 1985 for his disclosure of the questions to the newspapers. We may infer from these verdict answers that Barnhill was discharged between January 23, 1985 (when Sharp and Lee first became aware of a disclosure) and March 26, 1985. Before January 27, 1985, Sharp and Lee only knew that

an unknown employee or employees had disclosed the questions to the *Capital Times.* That reporter did not reveal his source. Sharp and Lee knew on January 27 that Barnhill had made disclosures to the *Milwaukee Journal,* because that article quoted Barnhill.

With those facts before them, Sharp and Lee, as reasonable officials, must be held to have known that they could not discharge Barnhill without infringing his first amendment rights. They could not discharge Barnhill for the disclosure to the *Capital Times,* since they did not know who had made it. They could not discharge Barnhill for the disclosure to the *Milwaukee Journal* because of *Hanneman.* That case had held some nine years earlier a public employee cannot be discharged for speech relating to a matter of public concern when his speech publicized once-confidential information which had been previously disclosed. 528 F.2d at 754–55.[7] The *Hanneman* decision is sufficiently clear as established authority for that proposition. A search of the law would have discovered the *Hanneman* decision, and whether or not Sharp and Lee knew of it is immaterial to our analysis.

We therefore conclude that Sharp and Lee do not have qualified immunity.

8. PUNITIVE DAMAGES

The federal common law of damages controls a punitive damage award under sec. 1983. *Erwin v. County of Manitowoc,* 872 F.2d 1292, 1299 (7th Cir. 1989). Punitive damages may be awarded in sec. 1983 actions "when the defendant's conduct is shown to be motivated by evil

---

[7]*Hanneman* is described more fully in part 4 of this opinion.

motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983). *Smith* requires conduct that is "outrageous" in that it is inspired either by "evil motive" or shows "reckless indifference" to the rights of others. *Hernandez-Tirado v. Artau,* 874 F.2d 866, 869 (1st Cir. 1989).

*Soderbeck v. Burnett County,* 752 F.2d 285, 291 (7th Cir. 1985), *cert. denied,* 471 U.S. 1117 (1986), discusses the nature of reckless indifference to a first amendment right. The case involved the discharge of a sheriff's department employee by a newly elected sheriff. The employee was the wife of the outgoing sheriff but was arguably a confidential employee. 752 F.2d at 287–88. The trial court vacated the punitive award, and on appeal the *Soderbeck* court affirmed that decision.

The *Soderbeck* court resolved a question regarding reckless conduct left unanswered in *Smith v. Wade:* whether it is necessary to an award of punitive damages in a sec. 1983 action to show that the defendant *knew* he was violating the plaintiff's legal rights. 752 F.2d at 289. The court concluded that reckless indifference requires knowledge of some type of wrongdoing and that a contrary interpretation does not comport with the purpose of punitive damages to deter similar conduct.

> The difference between deliberate and reckless harm is the difference between wanting to hurt someone and knowing that hurting someone is a highly likely consequence of an act undertaken for a different end. But in the latter case there must be knowledge of the danger that the defendant's act creates, which in this case is a danger of depriving a public employee of her freedom of speech; and the knowledge of this danger presupposes some knowledge of the free-speech rights of public employees.

308

This point can be made clearer by noting that a primary purpose (we think *the* primary purpose) of punitive damages, both generally and in section 1983 cases, is to deter. Unless the defendant knew that the conduct which resulted in the injury to the plaintiff was forbidden, an award of punitive damages will have no deterrent effect.

. . ..

The words used to mark off the domain of punitive damages—words like "maliciously," "wantonly," "oppressively," "spitefully"—indicate that punitive damages, like criminal fines which they resemble, are reserved for cases where the wrongfulness of the defendant's conduct is conspicuous, implying that its wrongfulness is apparent to the person who engages in it, and not just to a lawyer. If one needed great subtlety to realize that one had strayed into the forbidden zone where punitive damages are a sanction, the deterrent effect of such damages would be distorted. Some people would stray into the zone unknowingly; as to them the threat of punitive damages would not deter. Others would steer far clear of the zone, not knowing where it began; as to them lawful as well as unlawful conduct would be deterred. We may therefore set it down as a condition of awarding punitive damages that the defendant almost certainly knew that what he was doing was wrongful and subject to punishment.

*Soderbeck,* 752 F.2d at 290–91 (citation omitted).

The same standard applies to Sharp and Lee. They could not recklessly disregard Barnhill's right of free speech unless they *knew* that discharging him violated that right. That Sharp and Lee should have known that such was the result of discharging him may justify the

309

award of compensatory damages, *Harlow,* 457 U.S. at 818-19, but it cannot justify punitive damages.

> [P]unitive damages are not permissible absent evidence that the defendant actually intended to bring about the discharge of current employees in violation of their First Amendment rights. This is true even though a jury could reasonably have found . . . [defendants] liable for compensatory damages, and even though plaintiff's rights were sufficiently well established to defeat defendant's claim of qualified immunity. These findings merely establish what amounts to negligent behavior, and do not rise to the level necessary to support punitive damages.

*Marin-Piazza v. Aponte-Roque,* 873 F.2d 432, 435 (1st Cir. 1989) (citations omitted); *see also Wulf v. City of Wichita,* 883 F.2d 842, 867 (10th Cir. 1989) ("[i]t does not matter that we have concluded that [the defendant's] perception of disruption was *objectively* unreasonable, because an award of punitive damages requires an assessment of his *subjective* state of mind").

The jury was instructed as follows:

> Punitive damages are never a matter of right. It is in the jury's discretion to award or withhold them. Punitive damages may not be awarded unless the defendant deliberately violated the plaintiff's rights. Even if you find that the violations are reckless or deliberate, you may withhold or allow punitive damages as you see fit.
>
> If you find that the defendant's conduct was motivated by evil motive or intent, such as ill will or spite or grudge either toward the injured person individually or toward all persons such as plaintiff, then you may find that the defendant deliberately violated the plaintiff's rights.

310

Acts are reckless when they represent a gross departure from ordinary care. *If the defendant* was in a position in which he certainly *should have known that his conduct would violate the plaintiff's rights,* and proceeded to act in disregard of that knowledge and of the harm or the risk of harm that would result to the plaintiff, then he acted with reckless disregard for the plaintiff's rights.

In answer this question [sic], you are instructed that the burden is on the plaintiff to convince you to a reasonable certainty by evidence that is clear, satisfactory, and convincing that the answer should be "yes." [Emphasis added.]

Sharp and Lee each testified that he believed Barnhill had violated the pledge of confidentiality. They consulted with university legal counsel,[8] who advised that they call Barnhill in to discuss their concern that he might again disclose survey questions. Lee denied he was told that he could not fire an employee "for doing something that he had a right to do as a matter of free speech." Barnhill was told to talk with the associate field director. He never did so.

The jury could reasonably have found that despite their protestations to the contrary, Sharp and Lee knew they violated Barnhill's right of free speech when they fired him. They are expert in a field that deals with speech activity. They oversee the solicitation of opinions. A jury could infer they knew they violated Barnhill's rights when they fired him. But the jury could also have believed the testimony by Sharp and Lee regarding their conduct. In that case, the jury, properly instructed, could not have awarded punitive damages.

---

[8]The university counsel did not testify.

Under sec. 752.35, Stats., we may reverse in the interest of justice if the real controversy has not been tried. Faulty but unobjected to jury instructions may cause the real controversy not to have been tried. *Vollmer v. Luety,* 156 Wis. 2d 1, 456 N.W.2d 797 (1990). Because the jury was improperly instructed regarding the conditions under which punitive damages could be awarded, the real controversy was not tried with respect to that award.

We will seldom rescue parties from the effects of erroneous instructions they allow the trial court to submit without objection. However, if punitive damages are improperly awarded in 42 U.S.C. sec. 1983 cases, the deterrent role of those damages is thwarted. *Soderbeck,* 752 F.2d at 290. Because of the important role of punitive damages in retaliatory discharge cases, we exercise our discretion under sec. 752.35, Stats., to order a new trial, limited to whether punitive damages may be awarded.[9] The amount of that award should not be retried.

We reverse the judgment as it relates to punitive damages and remand for a new trial. The availability of punitive damages will be the only issue on retrial, and the trial court must instruct the jury in a manner consistent with this opinion.

*By the Court.*—Judgment affirmed in part; reversed in part and cause remanded.

SUNDBY, J. *(dissenting).* "If 'hard cases make bad law,' unusual cases surely have the potential to make

---

[9]We may order a retrial limited to a damages issue. *Hanz Trucking v. Harris Bros. Co.,* 29 Wis. 2d 254, 268–69, 138 N.W.2d 238, 246 (1965).

even worse law." *Department of the Air Force v. Rose,* 425 U.S. 352, 382 (1976) (Burger, C.J., dissenting). This is an unusual case: a public employee breaches his duty of confidentiality, voluntarily quits,[1] sues, and recovers $80,665.87, including $20,000 for mental anguish and $25,000 punitive damages. This result is not only bad law, it offends common sense. I therefore dissent.

I disagree with the majority in three respects. First, I do not agree that Barnhill's disclosure of the survey questions was protected speech. Second, I do not agree that Barnhill's interest in disclosing the survey questions outweighed the Wisconsin Survey Research Laboratory's interest in maintaining the confidentiality of those questions. Finally, I conclude that the majority failed to apply the "clearly-established law" standard to the individual defendants' qualified immunity defense.

Because it is so clear that the individual defendants, who were Barnhill's superiors[2] and are alleged to have discharged Barnhill, are immune from liability and that immunity disposes of the case,[3] I restrict my discussion primarily to that issue.[4] It will be necessary, however, to

[1] The jury's finding that Barnhill was discharged is unsupportable. He clearly quit. The defendants, however, do not attack that finding. For purposes of my analysis, therefore, I assume Sharp and Lee discharged Barnhill.

[2] Professor Harry Sharp is the director of the Wisconsin Survey Research Laboratory. Robert Lee was WSRL's field director.

[3] The circuit court held that the Board of Regents is immune from liability on a 42 U.S.C. sec. 1983 claim. Barnhill did not appeal that holding.

[4] Where the public official defendant alleges the affirmative defense of qualified immunity, that issue should be decided prior to trial, if possible. "Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity *is entitled to dismissal before the commencement of discovery.*" *Mitchell v. Forsyth,* 472 U.S. 511, 526 (1985)

discuss the first amendment issue because whether the defendants are entitled to qualified immunity depends on how well Barnhill's first amendment rights were established, if in fact his speech was protected by the first amendment.

## I.

At the outset, it is necessary to identify Barnhill's speech which he claims was protected. The law as to certain speech may be clearly established while the law as to other speech may not. The jury responded "yes" to the question: "Was Mr. Barnhill discharged because he disclosed materials concerning the shopping mall survey to the newspaper(s)?" The materials Barnhill disclosed concerning the shopping mall survey were the survey questions. Barnhill could not disclose the survey results because he didn't know the results. Barnhill disclosed the survey questions to reporters to support his thesis that the survey was slanted so as to elicit responses supporting the position of shopping mall operators in pending litigation.

The jury was not asked whether Barnhill was discharged because of the *content* of his speech criticizing the university for conducting surveys for inappropriate

---

(emphasis added). The defendant's entitlement to qualified immunity is "an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.* (emphasis in original). One of the pernicious effects of erroneously permitting a case to go to trial is that the focus may shift, as it did here, from whether the law was "clearly established" when the defendant acted, to a hindsight determination of whether the plaintiff's interest outweighed the government's interest.

purposes and inappropriate clients.[5] Barnhill states that the first amendment issue is: "Did the interests of the Wisconsin Survey Research Center [sic] . . . in keeping a survey schedule confidential outweigh the interests of [Barnhill] in disclosing the text of the survey questions to newspapers while the survey was still underway?"

Thus, we are presented with a much narrower issue than that decided by the circuit court and the majority. The circuit court concluded that Barnhill's speech "was an attempt to bring to light potential wrongdoing on the part of defendants." The majority states: "Barnhill exercised his right of free speech to comment about the rela-

---

[5]In his letter of November 27, 1984, to the field director, Barnhill wrote:

> I feel compelled to explain why I believe this is an inappropriate study for the university to be undertaking . . .. The issue [free speech in shopping malls] is a legal question and will appropriately be decided by the courts. The university should not be lending its name and reputation to one party in this dispute. Would the survey look the same if the ACLU had designed the questionnaire? Clearly a bias has been introduced by our client that may be used in a partisan way that may not be in the public interest . . ..

His letter was provided to several newspapers which quoted from it..

The *Daily Cardinal* article of February 7, 1985 quotes Barnhill as accusing the university of allowing its reputation to be used "to legitim[a]tize this unconstitutional policy by doing 'research' that masquerades public relations propaganda behind the cloak of objective science." The *Milwaukee Journal* article of January 27, 1985 reported Barnhill as saying that the shopping mall study was biased "simply because it was being paid for by representatives of the shopping center industry." Barnhill reportedly criticized the survey as "not scientific" and "not in the public interest." He was quoted as saying, "It seemed to me [the survey's] purpose was not so much to measure public opinion as to mold public opinion."

tionship between the state university and private business." Maj. op. at 296–97.

Both courts applied the "clearly-established" standard at a level of generality that nullifies the defense of qualified immunity. "The Supreme Court has warned that in determining whether the law was clearly established, a court should be careful not to test the rule of law at such a level of generality as to render unavailable the defense of qualified immunity." *Melton v. City of Oklahoma City,* 879 F.2d 706, 729 n.37 (10th Cir. 1989), citing *Anderson v. Creighton,* 483 U.S. 635, 639 (1987).

The courts should have tested the "clearly-established" rule of law against the facts of this case. The test in this case is: Was Barnhill's first amendment speech interest in disclosing confidential information acquired by him in the course of his employment so clearly established that the individual defendants knew or should have known that they would violate his constitutional rights if they discharged him for breaching his duty of confidentiality?

## II.

### A.

The general contours of the defense of qualified immunity are by now well sculpted. In *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982), the Court held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Put another way, a claim for qualified immunity would be defeated only if an official " '*knew or reasonably should have known* that the action he took within his sphere of official responsi-

bility would violate the constitutional rights of the [plaintiff]' . . . (emphasis added)." *Id.* at 815 (quoting *Wood v. Strickland,* 420 U.S. 308, 322 (1975)).

Since *Harlow,* the Court has more specifically shaped the contours of the qualified immunity defense. In *Malley v. Briggs,* 475 U.S. 335, 341 (1986) the Court said that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." In *Mitchell v. Forsyth,* 472 U.S. 511, 528 (1985) the Court held that public officials are immune unless "the law clearly proscribed the actions" they took. In *Anderson v. Creighton,* 483 U.S. 635, 639–40 (1987), the Court comprehensively explained the application of the *Harlow* standard:

> [W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action assessed in light of the legal rules that were "clearly established" at the time it was taken.
>
> The operation of this standard, however, depends substantially upon the level of generality at which the relevant "legal rule" is to be identified. For example, the right to due process of law is quite clearly established by the Due Process Clause, and thus there is a sense in which any action that violates that Clause (no matter how unclear it may be that the particular action is a violation) violates a clearly established right. *Much the same could be said of any other constitutional or statutory violation.* But if the test of "clearly established law" were to be applied at this level of generality, it would bear no relationship to the "objective legal reasonableness" that is the touchstone of Harlow. Plaintiffs would be able to convert the rule of qualified immunity that our cases plainly establish into a rule of virtually unqualified

liability simply by alleging violation of extremely abstract rights. Harlow would be transformed from a guarantee of immunity into a rule of pleading. Such an approach, in sum, would destroy "the balance that our cases strike between the interests in vindication of citizens' constitutional rights and in public officials' effective performance of their duties," by making it impossible for officials "reasonably [to] anticipate when their conduct may give rise to liability for damages." It should not be surprising, therefore, that our cases establish that the right the official is alleged to have violated must have been "clearly established" *in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.* This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law *the unlawfulness must be apparent.*

*Anderson,* 483 U.S. at 639–40 (citations omitted; emphasis added).

## B.

The seventh circuit court of appeals has applied the *Harlow* standard, as explained in *Anderson,* in several cases:[6] *Greenberg v. Kmetko,* 840 F.2d 467 (7th Cir. 1988); *Rakovich v. Wade,* 850 F.2d 1180 (7th Cir. 1988) (en banc), *cert. denied,* 488 U.S. 968 (1988); *Cleveland-*

---

[6]These cases were decided after Barnhill's supposed discharge. However, I do not cite them for the proposition that Barnhill's first amendment rights were not clearly established at that time. I cite them to explain how the *Harlow* standard, as elaborated in *Anderson,* is to be applied.

*Perdue v. Brutsche,* 881 F.2d 427 (7th Cir. 1989), *cert. denied,* 59 U.S.L.W. 3326 (U.S. Oct. 30, 1990) (No. 89-1167).

In *Greenberg,* the court held that merely stating that a social worker had the right to be free from retaliation for exercise of his first amendment rights, stated the legal principle at issue in overly abstract terms. The court remanded the case to the district court for reconsideration in light of *Anderson.*

In *Rakovich* a member of a Wisconsin city's civil service commission alleged that the police chief and police officers initiated an investigation of his activities in retaliation for his criticism and past disagreements with the police department and individual officers. The court, *en banc,* held that the officers were qualifiedly immune because their conduct did not violate plaintiff's clearly-established rights. Applying the principles of *Anderson,* the court said:

> The factual circumstances of the alleged violation need not be "identical" to prior holdings in order to find an officer entitled to qualified immunity. *LeClair v. Heart,* 800 F.2d 692, 696 (7th Cir. 1986) (citing *People of Three Mile Island v. Nuclear Regulatory Commissioners,* 747 F.2d 139, 148 (3d Cir. 1984) (no qualified immunity if the defendant violated "a clearly established and well litigated general proposition in which the case at hand merely represents a new factual wrinkle")). Nonetheless, "[c]losely analogous cases, those decided before the defendants acted or failed to act, are required to find that a constitutional right is clearly established." *Powers v. Lightner,* 820 F.2d 818, 821 (7th Cir. 1987) (divided panel) (citing *Lojuk v. Johnson,* 770 F.2d 619, 628 (7th Cir. 1985) ("While cases involving the exact fact pattern at bar are unnecessary, case law in a closely analogous area is crucial to permit us to

conclude that reasonably diligent government officials would have known of the case law, related it to the situation at hand, and molded their conduct accordingly.") However, this does not mean that only binding precedent will clearly establish a right.

> Therefore, "[i]n the absence of binding precedent, a court should look to whatever decisional law is available to ascertain whether the law is clearly established under *Harlow*." A review of these cases should focus only on rights clearly established in their respective contexts . . .. *Lojuk,* 770 F.2d at 628.

*Powers,* 820 F.2d at 821.

'This means that . . . public officials are entitled to immunity unless it has been authoritatively decided that certain conduct is forbidden.'

*Rakovich,* 850 F.2d at 1209–1210 (citations omitted).

*Cleveland-Perdue* is pertinent because there, as here, there was no controlling precedent. The mother of a deceased inmate brought an action against prison officials to recover for inadequate medical treatment of the inmate, alleging that the prison officials violated the inmate's eighth amendment right to be free from cruel and unusual punishment. The court said:

> [O]ur independent research has revealed no decision by this court recognizing that a failure to remedy systemic deficiencies in health care services at a prison violated the eighth amendment prior to 1983 . . .. The presence of a controlling precedent is not, however, a *sine qua non* of a finding that a particular right has been clearly established within the meaning of *Harlow.* In the absence of a controlling precedent, we look to all relevant caselaw in an effort to determine whether at the time of the alleged acts a suffi-

cient consensus had been reached indicating that the official's conduct was unlawful. To state the proposition in another way, we seek to determine whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time. This approach makes eminent sense for it precludes an official from escaping liability for unlawful conduct due to the fortuity that a court in a particular jurisdiction had not yet had the opportunity to address the issue.

*Cleveland-Perdue,* 881 F.2d at 431 (citations omitted).

After reviewing the relevant case law, the court concluded that the prison officials were not qualifiedly immune because there was a clear consensus that a prison official's failure to remedy systemic deficiencies in medical services akin to those alleged constituted deliberate indifference to the inmate's medical needs, and violated his eighth amendment rights. *Id.*

*See also Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir. 1987) ("[T]he test for immunity should be whether the law was clear in relation to the specific facts confronting the public official when he acted"), and *Green v. Carlson,* 826 F.2d 647, 649 (7th Cir. 1987) (district court erred in not considering specific facts of case).

## C.

Under *Anderson,* we may not examine the individual defendants' defense of qualified immunity abstractly and solely in terms of general first amendment rights. We must review the facts and determine whether, in the light of pre-existing law, the unlawfulness of Barnhill's discharge was apparent or should have been apparent to the individual defendants. The appropriate level of generality at which we must apply the *Harlow* standard is

the disclosure by a public employee of confidential information imparted to the employee during his or her employment. Neither the circuit court nor the majority has applied the *Harlow* standard at the appropriate level of generality.

In my research of pre-existing law, I did not expect to find a "spotted cow" case, *i.e.,* one in which a public employee was discharged for disclosing a survey schedule. I was not disappointed. Nor did I find "closely analogous" cases from which I could conclude with fair assurance that the recognition of a public employee's first amendment right to disclose confidential information imparted to the employee by the public employer was merely a matter of time. Without a "clear trend" in the case law recognizing such first amendment rights, Sharp and Lee could not have "known"[7] that they would violate Barnhill's first amendment rights if they discharged him for disclosing the confidential survey schedule.

There is, however, sufficient case law and authority from which the individual defendants could have con-

---

[7]Barnhill argues that because Sharp and Lee consulted university counsel who advised caution, they "knew" that they would violate his first amendment rights if they discharged him. I reject that argument as against public policy. Investigating the state of the law would be punished, and ignorance rewarded. "Where an official could be expected to know that his conduct would violate statutory or constitutional rights, he *should* be made to hesitate . . .." *Mitchell v. Forsyth,* 472 U.S. at 524 (quoting *Harlow,* 457 U.S. at 819 (emphasis added in *Mitchell))*. In any event, the defendants' subjective beliefs are irrelevant. *See Egger v. Phillips,* 710 F.2d 292, 314 (7th Cir. 1983), *cert. denied,* 464 U.S. 918 (1983). "[H]indsight-based reasoning on immunity issues is precisely what *Harlow* rejected. The decisive fact is not that Mitchell's position turned out to be incorrect, but that the question was open at the time he acted." *Mitchell,* 472 U.S. at 535.

cluded that they could discharge Barnhill for disclosing confidential information without violating his constitutional rights, including his first amendment rights. There was also statutory authority in the form of Wisconsin's "whistleblower" laws from which Sharp and Lee could reasonably have concluded that they could discharge Barnhill for violating his duty of confidentiality.

## (1)

In *Snepp v. United States,* 444 U.S. 507 (1980),[8] the Court held that an ex-CIA agent's publication of a book about the CIA without the CIA's prior review and approval, was a breach of the agent's fiduciary obligation arising from his employment agreement. As an express condition of his employment, Snepp had executed an agreement with the CIA promising that he would "not . . . publish . . . any information or material relating to the Agency, its activities or intelligence activities generally, either during or after the term of [his] employment . . . without specific prior approval by the Agency." *Id.* at 508. His promise was an integral part of his undertaking "not to disclose any classified information relating to the Agency without proper authorization." *Id.* Upon the eve of his departure from the agency, Snepp also executed a "termination secrecy agreement," which reaffirmed his obligation.

The government brought action to enforce Snepp's agreement. Snepp claimed that his agreement was unenforceable as a prior restraint on protected speech. The Court rejected his claim, finding that the agreement that Snepp signed was a reasonable means for protecting the

[8] *See* discussion of this case in Annotation, *Public Employee's Right of Free Speech Under Federal Constitution's First Amendment—Supreme Court Cases,* 97 L. Ed. 2d 903, 926.

government's vital interests. *Snepp,* 444 U.S. at 509 nn. 3b, 4b.

I recognize that there is a vast difference between national security interests and WSRL's interest in preserving the confidentiality of its survey schedule. The difference, however, is one of degree, not of kind. This is evident from the cases cited by the Court where it had made clear that, even in the absence of an express agreement, the government may protect substantial government interests, other than national security interests, by imposing reasonable restrictions on employee activities that in other contexts might be protected by the first amendment. *Id.,* citing *CSC v. Letter Carriers,* 413 U.S. 548 (1973) (provision of Hatch Act forbidding federal employees from "tak[ing] an active part in political management or in political campaigns" constitutional); *Brown v. Glines,* 444 U.S. 348 (1980) (air force regulations requiring commander's approval for serviceman's circulation of petitions on base, not violative of first amendment); *Buckley v. Valeo,* 424 U.S. 1 (1976) (provisions of Federal Election Campaign Act imposing ceilings on political contributions did not violate first amendment speech and association rights); *Greer v. Spock,* 424 U.S. 828 (1976) (military post regulations prohibiting political speeches and barring distribution or posting of any publication without prior written approval not constitutionally invalid on their face); and *Cole v. Richardson,* 405 U.S. 676 (1972) (state's statutory loyalty oath constitutionally permissible under first and fourteenth amendments).

Applicable is the following statement of the Court: "Undisputed evidence in this case shows that a CIA agent's violation of his obligation to submit writings about the Agency for prepublication review impairs the CIA's ability to perform its statutory duties." *Snepp,* 444

U.S. at 512. Barnhill's violation of his obligation to keep the survey schedule confidential, at least during the survey, materially impaired WSRL's ability to produce an untainted survey.

The *Snepp* court made clear that it did not consider that Snepp's fiduciary obligation was limited to "classified" information. The Court noted that Justice Stevens, in his dissent, conceded that, even in the absence of a written contract, an employee has the fiduciary obligation to protect confidential information obtained during the course of his employment. The Court said:

> In this case, [Justice Stevens] seems to think that the common law would not treat information as "confidential" unless it were "classified." We have thought that the common-law obligation was considerably more expansive. *See*, e.g., Restatement (Second) of Agency secs. 396(c), 400 and Comment c, 404, and Comments b, d (1958); 5A Scott, Trusts sec. 505 (3d ed. (1967).

*Id.* at 515 n.11 (citation omitted). Therefore, Barnhill's claim that he did not understand that his pledge of confidentiality extended to the survey schedule introduces an irrelevant consideration.[9] Barnhill owed a common-

---

[9]In addition to being irrelevant, Barnhill's claim that he did not know that his pledge extended to the survey schedule is disingenuous. Barnhill cannot seriously argue that his pledge of confidentiality extended to the survey results but not to the survey questions. Barnhill was not a neophyte in survey research. On his employment application he stated that he had done extensive employment survey work. His pledge and the explanatory manual clearly and unambiguously imposed a duty of confidentiality upon Barnhill which extended to *all* information obtained by him in the course of conducting surveys on behalf of WSRL. The pledge read in part as follows: "I, ———, as an interviewer for the Wisconsin Survey Research Laboratory, promise that I will main-

law duty of confidentiality to WSRL, explained as follows in the Restatement (Second) of Agency:

> Unless otherwise agreed, an agent is subject to a duty to the principal not to use or to communicate information confidentially given him by the principal or acquired by him during the course of or on account of his agency or in violation of his duties as agent . . . to the injury of the principal . . ..

Restatement (Second) of Agency sec. 395 (1958).

Comment a. to sec. 395 states, "The agent . . . has a duty not to use information acquired by him as agent . . . for any purpose likely to cause his principal harm or to interfere with his business . . .." The only exception is that the agent is privileged to reveal information confidentially acquired in the protection of a superior interest of himself or of a third person. Comment f. states:

> An agent is privileged to reveal information confidentially acquired by him in the course of his agency in the protection of a superior interest of himself or of a third person. Thus, if the confidential information is to the effect that the principal is committing or is about to commit a crime, the agent is under no duty not to reveal it . . ..

tain professional ethical standards of confidentiality while performing my duties. This means *all* information obtained during the course of conducting this research will be held in strict confidence." (Emphasis added.)

The Manual for Telephone Interviewers explained that, "The confidentiality pledge serves two purposes. The first and primary purpose is that it indicates to the Laboratory, you, the interviewer, understand your responsibility to keep *all* information you gather while performing your duties for WSRL confidential, and that you *agree* [emphasis in original] to this commitment." (Emphasis added.)

In Wisconsin, the public employee-agent's privilege to reveal confidential information has been expanded by the "whistleblower" statutes, subch. III. ch. 230 and sec. 895.65.[10] Sec. 10, 1983 Wis. Act 409, effective May 11, 1984. These statutes prohibit government employer retaliation against a government employee for lawfully disclosing "information" in the exercise of his or her rights under the first amendment to the U.S. Constitution or art. I, sec. 3, of the Wisconsin Constitution.

"Information," under each statute, sec. 230.80(5), Stats., and sec. 895.65(1)(d), Stats., is defined to mean "information gained by the employe which the employe reasonably believes demonstrates: 1. A violation of any state or federal law, rule or regulation. 2. Mismanagement or abuse of authority in state [or local (sec. 230.80(5))] government, a substantial waste of public funds or a danger to public health and safety."

"Mismanagement" is defined in sec. 230.80(7), Stats., to mean "a pattern of incompetent management actions which are wrongful, negligent or arbitrary and capricious and which adversely affect the efficient accomplishment of an agency function. 'Mismanagement' does not mean the mere failure to act in accordance with a particular opinion regarding management techniques."

"Substantial waste of public funds" means "an unnecessary expenditure of a substantial amount of money or a series of unnecessary expenditures of smaller amounts of money." Sec. 230.80(9), Stats.

---

[10]The circuit court held that Barnhill's state-law claim under sec. 895.65, Stats., was barred because he failed to give notice of his claim as required by sec. 893.82(2), Stats.

In view of these statutes, the individual defendants cannot claim that the law in Wisconsin in 1985, preventing them from discharging an employee for disclosing "information," as defined in secs. 230.80(5) and 895.65(1)(d), Stats., was not clearly established. However, the survey questions disclosed by Barnhill were clearly *not* "information" as defined in the "whistleblower" statutes. We need not consider whether Barnhill's criticisms that the university should not be engaged in this kind of research or that the survey was biased constituted "information" as defined in these statutes. Barnhill has limited the issue to his first amendment right to disclose the survey schedule.[11]

## D.

The Wisconsin legislature could not, of course, by narrowly defining "information," permit government employers to discipline public employees for the exercise of their first amendment rights under the U.S. Constitution. Even though Barnhill's criticisms of the university and the survey itself did not constitute "information" under Wisconsin's whistleblower statutes, they would, in the proper context, constitute protected speech. However, there was no case law support in 1985 for the proposition that such criticisms were protected as "whistleblowing."

Therefore, the inquiry narrows sharply. The question is whether the individual defendants should have

---

[11]I conclude that the only possible "whistleblowing" was Barnhill's expressed belief that the survey was biased. This, however, is no more than a difference of opinion regarding management techniques which would not constitute information within the meaning of secs. 230.80(5) and 895.65, Stats. *See* sec. 230.80(7).

known from analogous cases that the first amendment prevented them from imposing and enforcing a duty of confidentiality upon interviewer-employees. I conclude that the interests which Barnhill sought to further in disclosing the survey schedule were not sufficient to accord him a privilege to reveal the information confidentially acquired by him in the course of his employment, at least during the progress of the survey. Others may differ with my conclusion in this respect, but I see no room for the conclusion that the individual defendants knew or should have known that they would abridge Barnhill's first amendment rights if they discharged him for violating his duty of confidentiality.

### (1)

The majority relies on one case to conclude that "existing caselaw was close enough to have warned Sharp and Lee in 1985 that discharge of Barnhill for his speech activity would be unlawful." Maj. op. at 306. The reason they should have been warned, the majority concludes, is that *Hanneman v. Breier,* 528 F.2d 750 (7th Cir. 1976) established that a public employee cannot be discharged for speech relating to a matter of public concern when his or her speech publicizes once-confidential information which has been previously disclosed. Maj. op. at 307. The majority states: "A search of the law would have discovered the *Hanneman* decision, and whether or not Sharp and Lee knew of it is immaterial to our analysis." *Id.*

Thus, the majority concludes that one decision, which I will show is inapposite, established the law so clearly that the unlawfulness of Sharp's and Lee's action should have been apparent to them. One decision may be enough to alert public officials to the constitutional

rights of public employees. However, *Hanneman v. Breier* is not *Harlow v. Fitzgerald* or *Perry v. Sindermann*, 408 U.S. 593 (1972); it is not a case which has commanded public attention and comment. The majority imposes on the public official, untrained in the law, a task which frequently daunts the most conscientious and skilled legal practitioner or judge. The public official's only responsibility is to keep abreast of the law affecting public employee's constitutional rights as it develops, and to conform his or her conduct to that law when it is "clearly established."

> We must be wary both of using hindsight to make an untidy body of case law seem clear and directive at the time the public official was called on to act, and of imagining that public officials have the training and experience in extracting legal rules from case law that appellate judges have.

*Colaizzi v. Walker,* 812 F.2d 304, 308 (7th Cir. 1987).

### (2)

In any event, had Sharp and Lee known where to look and had they discovered *Hanneman,* they would have discovered a case which has no application to the situation presented to them. In *Hanneman,* a front-page story in the *Milwaukee Journal* disclosed that an internal investigation into the political activity of Milwaukee Professional Policeman's Protective Association officers was under way. The leak of this story to the press was not attributed to MPPPA. The day after publication, MPPPA members, on its behalf, distributed to the mayor, the city council, the city's labor negotiator, and the state labor board, a letter which confirmed that MPPPA officers had been questioned by agents of the city in connection with their political activities. This

letter prompted a departmental investigation and resulted in charges being brought against these members for breaching the confidentiality of the department's internal affairs, in violation of a department rule.

The *Hanneman* court concluded that the confidentiality regulation was "clearly valid on its face. A public employer has a legitimate interest in preserving confidentiality in the conduct of its internal affairs." *Hanneman*, 528 F.2d at 754. The court held, however, that by the time the officers' letter appeared, the police chief's ability to conduct his internal investigation in private had already been destroyed by the newspaper article disclosing the existence of the investigation and the persons and subjects involved. *Id.* Thus, the court held that once the matter was placed in the public eye, the officers had a legitimate interest, protected by the first amendment, in bringing any improper anti-union conduct by the chief of police in connection with the investigation to the attention of government officials outside the police department.

Unlike *Hanneman,* here there was no public disclosure of the survey's existence, the survey questions or the survey results. Lee was informed by a *Capital Times* reporter that the newspaper had the text of the survey questions. However, the *Capital Times* did *not* publish a story about the survey. On the same day, Lee issued a memorandum to WSRL field staff informing them that "[a] very serious violation of confidentiality has occurred at the Lab." Lee warned staff that the person or persons who had made the survey schedule available to the *Capital Times* had violated the oath of confidentiality they were committed to as Lab employees. The majority is forced to assume that Barnhill was aware of this memo-

randum.[12] The disclosures which he made to the *Milwaukee Journal* and *The Daily Cardinal* were made after Lee issued the memorandum to WSRL field staff. Lee and Sharp knew only that there was a breach of confidentiality which had the *potential* to destroy or adversely affect the survey. Lee's memorandum was an attempt at damage control. The memorandum warned WSRL employees, including Barnhill, that revealing the survey schedule was a breach of the employee's oath of confidentiality.

Thus, the situation facing Sharp and Lee was completely different from that facing the Milwaukee Police Department. In *Hanneman,* the damage had been done. It was appropriate for the police officers to then participate in the public debate which followed the disclosure of the intra-department investigation. In contrast, Sharp and Lee faced only a *potential* breach of confidentiality, depending on what action the *Capital Times* took. As reasonably competent public officials, they would not have learned from *Hanneman* that they could not enforce against Barnhill the laboratory's confidentiality rule, which was made plain to all members of the WSRL field staff, including Barnhill, prior to the disclosures to the *Milwaukee Journal* and to *The Daily Cardinal.*[13]

---

[12]Barnhill's testimony was conflicting. The circuit court did not resolve the conflict by making a finding of fact. We cannot make findings of fact. *Wurtz v. Fleischman,* 97 Wis. 2d 100, 107 n.3, 293 N.W.2d 155, 159 (1980).

[13]As the seventh circuit court of appeals has pointed out, the defendants in *Hanneman* did not show that the police officers were privy to confidential information that was not accessible to the ordinary citizen. *Conner v. Reinhard,* 847 F.2d 384, 390 (7th Cir. 1988), *cert. denied,* 488 U.S. 856 (1988). Thus, *Hanneman* involved a circumstance markedly different from that presented here.

*Hanneman* recognizes the validity of a public employer's regulation which prohibits employees from disclosing the confidential business of the employer. *Hanneman* permits a first-amendment exception to such a rule only in the case where enforcing the rule becomes meaningless through prior public disclosure of the public employer's business. *Hanneman* has no application here except to affirm the validity of public employment rules of confidentiality.

I would reverse the judgment and direct the circuit court to enter judgment in favor of the individual defendants on their defense of qualified immunity.